## MAMMOTH OIL COMPANY ET AL. *v.* UNITED STATES.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 140.   Argued April 12, 13, 1927.—Decided October 10, 1927.

1. The lease and contract in this case—which involve *inter. alia* the letting of a Naval Petroleum Reserve for exploitation by a private corporation and a scheme for obtaining fuel oil and elaborate storage facilities for the Navy by means of the royalties of crude oil provided for the United States in the lease—were without authority of law, and the United States is entitled on that ground to have them canceled. *Pan American Petroleum Co. v. United States,* 273 U. S. 456. Pp. 35, 53.

2. The facts and circumstances in evidence require a finding that, pending the making of the lease and agreement, the representative of the Government (former Secretary of the Interior) who dominated the transactions, and the representative of the lessee corporation, contrary to the Government's policy for the conservation of oil reserves for the Navy and in disregard of law, conspired to procure for the company all the products of the reserve on the basis of exchange of royalty oil for construction work, fuel oil, etc.; that the former so favored the latter and the making of the lease and agreement that it was not possible for him loyally or faithfully to serve the interests of the United States or impartially to consider the applications of others for leases in the reserve, and that the lease and agreement were made fraudulently by means of collusion and conspiracy between them.   P. 35.

3. Evidence is to be weighed according to the proof which it was in the power of one side to produce, and in the power of the other to contradict.   P. 51.

4. Having introduced evidence which, uncontradicted and unexplained, was sufficient to sustain its charge that the lease and contract were procured for the defendant corporation through fraud participated in by the principal representative of the company, the United States was not required to call him as a witness; and his silence makes strongly against the company. It is as if he personally held the lease, were defendant, and failed to testify.   P. 52.

5. While the failure of such representative to testify can not properly be held to supply any fact not reasonably supported by the substantive evidence in the case, it justly may be inferred that he was not in a position to combat or explain away any fact or circumstance so supported by evidence and material to the Government's case. P. 52.

6. There is no occasion to consider, and the Court does not determine, whether the former Secretary of the Interior was bribed. P. 53.

7. It was not necessary for the Government to show that it suffered or was liable to suffer loss or disadvantage as a result of the lease or that the former Secretary of the Interior gained by or was financially concerned in the transaction. P. 53.

8. An oil-purchasing company bought from the fraudulent lessee in this case the tanks which the latter had built or was building on the demised naval reserve under the lease and in pursuance of the fraudulent scheme, and used them for storing oil from an adjacent oil field. The purchaser was owned half and half by two companies whose boards of directors were headed, respectively, by S, who represented the lessee in obtaining the fraudulent lease, and by another person who had acted with him, shortly before the purchase, in controlling the purchasing company in respect of other important transactions

  Held, that the purchasing company must be presumed to have known that there was no law authorizing the lease; that the circumstances disclosed in the case were sufficient to impute to it S's knowledge of the fraud; and that it was not entitled to use or remove the tanks. P. 54.

9. A pipe-line company which, as the lessee's nominee, built a pipe-line and related improvements on the naval reserve, for transportation of oil therefrom, in pursuance of the fraudulent lease, and which was owned half and half by the two companies referred to in the preceding paragraph as owners of the purchasing company therein mentioned, was chargeable with notice that the use of reserve oil to procure the construction of the pipe line was a part of the plan for the unauthorized exhaustion of the reserve; that such use furthered the violation of law and was contrary to the established conservation policy. It stands on no better ground than the lessee would have occupied if it had made the improvements in question. P. 55.

14 F. (2d) 705, affirmed.

CERTIORARI, 273 U. S. 686, to a decree of the Circuit Court of Appeals, which reversed a decree of the District

Court, 5 F. (2d) 330, dismissing a suit brought by the United States to cancel an oil and gas lease covering a Naval Petroleum Reserve in Wyoming, and to set aside also a supplementary agreement between the same parties. There were prayers for possession of the leased lands, for an accounting, and for general relief. The grounds of the suit were fraud and corruption, and lack of legal authority to execute the instruments. The court below sustained the Government's contention on the ground of fraud and corruption. Compare *Pan American Petroleum Co. v. United States*, 273 U. S. 456.

*Messrs. John W. Lacey* and *Martin W. Littleton*, with whom *Messrs. George P. Hoover, Paul D. Cravath, G. T Stanford, Herbert V. Lacey, J. W. Zevely, Douglas M. Moffat*, and *R. W. Ragland* were on the brief, for petitioner, Mammoth Oil Co.

The legal effect of the evidence is always a question of law. The rule in the federal courts has long been well settled that fraud is not to be presumed; that it is not to be presumed from any number of lawful acts; that where an act and circumstance are as consistent with an honest motive as with a dishonest one, the former must be preferred; that fraud cannot be proved by a bare preponderance of the evidence, but only by evidence that is clear, unequivocal and convincing.

No inference is reliably drawn from premises which are uncertain; nor can legitimate inferences be drawn from other inferences, nor presumptions indulged which rest upon the basis of another presumption. The law requires an open, visible connection between the principal fundamental facts and the deductions to be made on remote inferences. A presumption is not a circumstance in proof, and it cannot therefore be made the legitimate foundation for another presumption. There is no open and visible connection between the fact out of which the first presumption arises and the fact which is sought to be

established by the dependent presumption. *United States* v. *Ross,* 92 U. S. 281; *Manning* v. *Ins. Co.,* 100 U. S. 693; *Looney* v. *Met. Street Ry.,* 200 U. S. 480; *U. S. Fidelity Co.* v. *Bank,* 145 Fed. 273; *Vernon* v. *United States,* 146 Fed. 121; *Postal Tel. Co.* v. *Livermore,* 188 Fed. 696; *Cunard Co.* v. *Kelley,* 126 Fed. 610; *Davis* v. *United States,* 18 App. D. C. 468.

No unfavorable presumption arises from the failure to produce evidence unless there is some duty to produce it, nor unless it is shown to be within the control of the party who fails to produce it, nor from the failure to call as a witness one whom the other party had the same opportunity of calling, nor if the testimony not given is privileged. *Vajtauer* v. *Commr.,* 273 U. S. 103; *State* v. *Buckman,* 74 Vt. 309; *Cross* v. *L. S. Ry.,* 69 Mich. 363; *Bank* v. *Hyland,* 6 N. Y. Supp. 87; *Erie R. R.* v. *Kane,* 118 Fed. 223; *Scovill* v. *Baldwin,* 27 Conn. 316; *Bleeker* v. *Johnston,* 69 N. Y. 309; *Arbuckle* v. *Templeton,* 65 Vt. 205; *Crawford* v. *State,* 112 Ala. 1. No inference may be drawn from the refusal of the witness to testify on the claim of constitutional privilege against self incrimination. *Beach* v. *United States,* 46 Fed. 754; *State* v. *Harper,* 33 Ore. 524; *Powers* v. *State,* 75 Neb. 226; *State* v. *Weaver,* 165 Mo. 1.

A defendant is not called upon to introduce evidence to contradict or explain facts which are insufficient to establish any liability against him. The true rule is, that silence of a party may be considered in weighing proofs already adduced tending to fix a liability on him in matters where complete and more exclusive knowledge of the facts concerning which he is silent, is laid at his door. Jones, Evidence, 2d ed., vol. 1, § 104; *Owens Co.* v. *Kanawha Co.,* 259 Fed. 838; *Omar Co.* v. *Bair Co.,* 285 Fed. 588; *Stimpson* v. *Hunter,* 234 Mass. 61; *Shotwell* v. *Dixon,* 136 N. Y. 43; *Loper* v. *Askin,* 178 App. Div. 163; *Tex.*

*& Pac. Ry.* v. *Shoemaker,* 98 Tex. 451; *Blackman* v. *Andrews,* 150 Mich. 322; *Chi. Mill Co.* v. *Cooper,* 90 Ark. 326; *Thompson* v. *Davitte,* 59 Ga. 472; *Lowe* v. *Massey,* 62 Ill. 47; *New Orleans* v. *Gauthreaux,* 32 La. Ann. 1126.

The opinion of the Circuit Court of Appeals clearly discloses that bribery constitutes the basis of its adverse finding. There is no evidence that Mr. Sinclair ever received any Liberty bonds as a dividend or otherwise from the Continental Trading Co., or that he ever delivered any Liberty Bonds to Secretary Fall (except $25,000 of bonds loaned in June, 1923, which admittedly had no relation to the $230,500 lot of bonds). The court's conclusion is, therefore, entirely based upon inferences. The court itself so concedes. The finding that Sinclair delivered or caused to be delivered bonds to Secretary Fall in May, 1922, was pure inference drawn, not from any fact or circumstance disclosed by the record, but in the first instance from certain other basic inferences, and secondarily from numerous other basic inferences.

Counsel for the Government claim that the Court of Appeals "was not building one assumption upon another. It was making a single inference from many proven circumstances all pointing one way." An easy way to avoid pointing out any circumstances is, with a broad sweep of the hand, to say, "many circumstances." The Court of Appeals in fact concedes that it must conjecture as to how Everhart acquired the bonds and it infers that he got them from Sinclair by inferring that Sinclair was a stockholder in the Continental Trading Co., that as such stockholder he was entitled to receive in May, 1922, a dividend from the company, that he and he alone of the actual or alleged stockholders of the company, and he alone of all people, had a motive to bribe Secretary Fall, that Everhart could not have acquired the bonds in any way other than as a bribe for Secre-

tary Fall, and from those inferences drew the inference
that Sinclair did receive and deliver to Everhart or caused
to be delivered to him by the Continental Trading Co.,
Liberty Bonds in May, 1922, as a bribe for Secretary Fall.

Having inferred that Sinclair received Liberty Bonds
from the Continental Trading Co., and that he delivered
the bonds to Secretary Fall as a bribe, the court then sup-
ports its structure of inferences by two props of the same
material, namely, inferences drawn from the failure of the
Mammoth Oil Co. to call Secretary Fall and Sinclair as
witnesses to deny the charge of bribery. Fall was as
available to the Government as a witness as he was to the
Mammoth Oil Co. The fact that he did not demand to
appear as a witness in an action to which he was not a
party to deny a charge of corruption not made in the bill
is made the basis of an inference against the Mammoth
Oil Co. Sinclair's failure to take the stand and deny that
he was a stockholder in the Continental Trading Co., is
used by the court as the final and special ground for the
inference that he was such a stockholder, and his silence
in respect of the charge of bribery is treated as evidence
of the truth of the charge.

The Court of Appeals, in drawing additional inferences,
treated as facts from which to draw inferences, things not
shown by the record to be facts—indeed, things shown by
the record not to be facts; it drew inferences against the
petitioners from facts unrelated to the lease or contracts
in controversy and from facts with which neither the
petitioners nor anyone representing them had any con-
nection; it drew sinister inferences from facts and circum-
stances perfectly lawful and entirely consistent with
integrity, both of purpose and conduct; in the last
analysis it drew such inferences from its own inferred con-
clusion of bribery.

Was Secretary Denby's decision, that there was danger
of drainage, arbitrary or capricious or wholly unsupported
by evidence? *Silberschein* v. *United States,* 266 U. S.

221. This is a question of fact, and upon it the Court of Appeals concurred with the District Court in finding that the lease to the Mammoth Oil Co., was within the authority of the Act of June 4, 1920.

No officer of the Government is shown to have been remiss in any matter evidenced by the secrecy claimed, but it would not be enough that such officer were shown remiss in order to cancel the contracts here. It would be necessary to show in addition that the Mammoth Oil Co., or Sinclair, who represented it, participated in it or at least knew of the dereliction. This is the rule in actions to set aside conveyances with intent to defraud creditors. *Prewitt* v. *Wilson,* 103 U. S. 22; *Jones* v. *Simpson,* 116 U. S. 609; *Cohan* v. *Levy,* 221 Mass. 336; *In re Locust Co.,* 299 Fed. 756.

It is likewise true in cases where an agent with apparent authority disposes of his principal's property, the agent being guilty of fraud in the matter against his principal but without notice to or participation therein by the purchaser. *Andrews* v. *Solomon,* 1 Fed. Cas. 889; *Paxton* v. *Marshall,* 18 Fed. 361; *Brooks* v. *Dick,* 135 N. Y. 652; *Mason* v. *Bauman,* 62 Ill. 76; *Pac. Exp. Co.* v. *Carroll,* 66 Mo. App. 275; *Chetwood* v. *Berriman,* 39 N. J. Eq. 203; *Myers* v. *Mut. Ins. Co.,* 99 N. Y. 1. These authorities make it clear that secrecy and concealment by an agent manifested in his conduct toward his principal, even if a fraud on the principal, will not charge a third person dealing with the agent unless notice thereof be brought home to such third person.

The $25,000 loan by Sinclair to Fall in June, 1923, occurring as it did several months after Fall had gone out of office and over a year after both the execution of the lease and the inferred bribery in connection therewith, can not be treated as a matter upon which to base the inference of bribery. *United States* v. *Hancock,* 133 U. S. 193.

Applying to the statute the evidence as to the insecurity of the oil in the Reserve, the two courts below held that the lease in controversy was authorized by the statute. The result is that, with the statute construed as this Court apparently, though indirectly, construes it in the *Pan American* case, both courts below found that the facts brought the lease within it.

The money appropriation should not be construed to limit the authority to exchange for containers necessary to conserve the fuel oil and other products.

We submit that the concurring findings of the two courts below upon the following points are in accord with the great weight of the evidence, certainly not contrary to the evidence, much less " clearly " against the weight of the evidence.

First: That under the Act of June 4, 1920, the information to Secretary Denby as to the danger of the loss of petroleum to the United States from Naval Reserve No. 3 by drainage, was such as to invoke the exercise of his judgment and discretion as to the appropriate action to be taken to prevent such loss; that in the exercise of such judgment and discretion the Secretary determined to make and made and executed the lease in controversy for the benefit of the United States and as the appropriate action to prevent the threatened loss; and that " the authority granted by the Act of June 4, 1920, is sufficient to authorize the lease."

Second: That the Act of June 4, 1920, committed to the judgment and discretion of the Secretary of the Navy whether to use, store, exchange, or sell the royalty oils accruing to the United States under the lease, and that in the exercise of such judgment and discretion the Secretary disposed of such royalty oils to the lessee, taking from the lessee in consideration therefor an agreement by the lessee that it would compensate the United States for the royalties in either of three ways as the United States

might elect, (1) in cash, (2) in fuel oil, (3) in other oil products suitable for use by the Navy. As to fuel oil elected to be received in exchange, the United States might take such oil without containers, or it might, but only to the extent necessary, also receive containers for the conservation of the fuel oil received. Therefore, that " the authority granted by the Act of June 4, 1920, is sufficient to authorize the . . . contract " for the disposition of the royalty oils.

Third: That the existing facts on February 9, 1923, were such as to authorize the Secretary of the Navy in the exercise of his judgment and discretion to exchange the royalty oils from the leased lands for fuel oils and other products suitable for naval use, together with containers necessary for the conservation thereof, and, therefore, that " authority granted by the Act of June 4, 1920, is sufficient to authorize the . . . contract" of February 9, 1923.

Fourth: That neither of the contracts here involved was upon an inadequate consideration to the United States.

Fifth: That there is no general statute requiring competitive bidding in negotiating leases of oil lands of the United States or in disposing of its royalty oils; that the absence of competitive bidding will not render invalid the lease or the agreement disposing of the royalty oils; that as to the agreements in relation to such containers as might be necessary " the Act of June 4, 1920 . . . was complete in itself and that it did not repeal nor was it dependent on other acts with relation to the public lands " . . .; that " This special statute, not repealing the general statutes, the two stand together, one as the law relating to a special thing, viz., the naval reserves— the other relating to general public land matters. It was therefore unnecessary that there be competitive bidding or advertising as to the making of the lease and contract,

and other statutes with relation to the method of transacting the general public business of the United States were not applicable to this situation, the special statute fully covering the same."

If, however, it be held on any ground that the agreement as to constructing storage facilities is invalid, we submit that this would not destroy the other valid agreements, but in that case every matter relating to the invalid agreements must be stricken from the contracts. This would leave to the United States full compensation and what it has contracted should be full compensation for the lease and for the royalty oils which it disposed of to the lessee.

Where promises are in the alternative, the fact that one of them is at the time or subsequently becomes legally impossible of performance, does not relieve the promisor from performance of the legal promise. *Yankton Indians* v. *United States*, 272 U. S. 351; *Jenson* v. *Toltec Co.*, 174 Fed. 86; *DaCosta* v. *Davis*, 1 Bos. & P. 242; *Stevens* v. *Webb*, 7 Car. & P. 60; 3 Williston, Contracts, § 1779.

We submit that the finding of the Circuit Court of Appeals wherein it differs from the finding by the District Court and upon which it reversed the decree of the District Court, namely, the finding that there was bribery of Secretary Fall by the Mammoth Oil Co., or its representative, is not sustained by any evidence, but consists of inference, drawn not from any fact or circumstance proved but from numerous other inferences, the basic inferences themselves having been improperly and illegitimately drawn.

*Mr. Edward H. Chandler,* with whom *Mr. Ralph W. Garrett* was on the briefs, for petitioners, Sinclair Pipe Line Co., and Sinclair Crude Oil Purchasing Co.

*Messrs. Owen J. Roberts* and *Atlee Pomerene* for the United States.

The lease and contract were fraudulent. Badges of the fraud and conspiracy were:

1. The policy of conserving the oil in the ground as long as possible, and of making only protective leases for offset purposes, was changed to one of exploiting the whole reserve.

2. The policy of leasing only pursuant to advertisement and competitive bidding was changed to private negotiation.

3. In the private negotiations with Sinclair, competition for the lease, for the purchase of the royalty oil, and for the erection of storage tankage, was eliminated.

4. The quit-claiming of placer claims known to be invalid was made a condition precedent to a lease, and only Sinclair was given any practicable opportunity to secure the claims.

5. Applicants other than Sinclair for leases were told no leasing was contemplated or were not given information on which a comparable bid could be made or time in which to make one.

6. Newspapers, the general public, senators and congressmen were denied information and affirmatively misled to avoid competition and opposition to the plan.

7. Negotiations were so shrouded with secrecy that even departmental subordinates did not know what was being done and did not know of the change in policy.

8. Subleases were clandestinely promised to two persons desirous of territory in the reserve.

9. The possibility of drainage was exaggerated and used as a justification for the lease, but not in good faith.

10. After doubts as to the legality of the plan were expressed by eminent attorneys, submission of the ques-

tion to the Attorney General or Solicitor for the Interior Department was studiously avoided.

11. The lease was drafted in secrecy in the office of Sinclair's attorney.

12. Fall dominated the negotiations leading up to the making of the lease.

13. The $230,500 Liberty Bond transaction, through the Continental Trading Co., was a bribe.

14. Neither Sinclair nor Fall was called by appellants to testify. Everhart claimed privilege against self-incrimination. Other witnesses with knowledge of important facts refused to testify.

15. Sinclair got a lease estimated to be worth in profits to his company over $33,000,000.

A public officer is held to the highest standard of good faith and good morals in all his transactions. He is not permitted to act from any motives other than the welfare and advantage of the Government. If motives of a private or a personal nature sway him, or if he is influenced by personal favoritism and offers preferential treatment to his friends, such action is immoral, reprehensible, and renders voidable the transactions to which he thereby purports to bind the Government. Persons dealing with a government officer are held to an equally strict standard of morality. They are affected with knowledge of the limitations upon his powers and may not benefit in case he exceeds his powers. They may not do anything to influence him to violate his duty to the Government. If they induce him to act, or merely know that he is acting, from personal motives or from a desire to favor them and give them preferential treatment, they cannot enforce a contract so made. Personal solicitation which results in preferential treatment constitutes corruption and collusion, rendering voidable contracts made as a result of it. *Crocker* v. *United States*, 240 U. S. 74; *Hume* v. *United States*, 132 U. S. 406; *Garman* v.

*United States,* 34 Ct. Cls. 237; *Wash. Irr. Co.* v. *Krutz,* 119 Fed. 279. These cases were cited and relied upon by this Court 'in *Pan American Co.* v. *United States,* 273 U. S. 456.

The collusion between Sinclair and Fall taints the entire transaction, and neither' the Mammoth Oil Company, nor any of the other. appellants in this case, is entitled to receive any benefit therefrom. The particular type of fraud with which we are concerned in the present case is. collusion between an agent and a third party dealing with that agent. The fraud consists of improper motives upon which the third party induces the agent to act and as a result of which the agent does act in whole or in part. This is a different type of fraud from that which exists when false representations are made by one party to another upon which the second party relies and which are not in accordance with the truth.

In fraud arising from false representations the representation is an objective fact, the proof of which is within the knowledge of the injured party. The true state of facts is also capable of objective proof, which is usually not difficult to obtain. The only remaining element of proof necessary to establish the fraud is the knowledge of the falsity of the representation. It is clear that fraud of this type is more easily capable of proof than is fraud involving no objective representations.

The gist of fraud that consists solely in collusion is the inducing to act on the one side and the action on the other side from improper motives. Most of the dealings take place between the conspirators who have a common interest to continue to conceal their actions and their motives. There are no representations to the injured. party which can be laid hold of as a basis of objective . proof. The injured party must make up his proof out of a chain of circumstances which, taken as a whole, will show that the conspirators acted from improper motives.

When the proofs in the present case are examined in the light of proof that is reasonably possible, they are seen to be clear and convincing. The primary facts proved are substantially uncontradicted. There is no conflict in the testimony of witnesses as to the facts in evidence, nor is there any question as to the credibility of the Government's witnesses. The ultimate facts result from inferences arising upon the uncontradicted facts in evidence. Those inferences depend principally upon the common sense knowledge of the motives and actions of men in circumstances like the present.

It is not necessary that the fraud should be established beyond a reasonable doubt. It is merely necessary that the court should be of the opinion that a reasonable man would infer from the facts proved that the transaction was fraudulent. These principles for which we contend are supported by authority. *Rea* v. *Missouri,* 17 Wall. 532; *Glaspie* v. *Keator,* 56 Fed. 203; *Drake* v. *Stewart,* 76 Fed. 140; *Drennen* v. *Southern Fire Ins. Co.,* 252 Fed. 776; *Attorney General* v. *Pelletier,* 240 Mass. 264; *Lumpkin* v. *Foley,* 204 Fed. 372; *Ware* v. *United States,* 154 Fed. 577; *Castle* v. *Bullard,* 23 How. 172.

The silence of Sinclair is evidence of fraud. It is a fact to be considered not only in connection with The Continental Trading Company transaction, but also in connection with the negotiations for the lease and contract. Sinclair's silence is to be weighed in connection with his visit to Fall's home at Three Rivers, at the end of December, 1921, and with his curious appearance on the scene as the man of opportunity just prior to his offer of February 3, 1922. It is to be weighed in connection with his undue intimacy with Fall as further revealed by their many private conferences, their private " deals " over acreage for Shaffer and Hughes, and their private arrangement for the purchase and tender of the Pioneer and Belgo placer mining claims. Sinclair's silence must

be weighed in connection with the unusual and unique character of the entire negotiations between Fall and the man with whom he, as a government official, could deal in any honest way only at arms' length. Finally, but coincident with the unusual and suspicious chain of other circumstances, is Fall's proved accession of wealth from a source which reasonably narrows down to less than half a dozen men, of whom Sinclair was the only one shown to be then having dealings of any sort with Fall.

The weight to be given to the silence of a party to a cause is a matter of common sense rather than the result of a metaphysical concept. If no suspicious facts are proved, obviously no adverse inferences arise from the silence of a party. In direct proportion as the number and curious coincidence of suspicious facts increase, so also increases the weight to be given to a party's failure to explain such of those facts as are peculiarly within his control and knowledge. *Bilokumsky* v. *Todd,* 263 U. S. 149; *United States* v. *Commr. of Immigration,* 273 U. S. 103; *Runkle* v. *Burnham,* 153 U. S. 216; *Penna. R. R.* v. *Anoka Bank,* 108 Fed. 482; *Missouri &c. R. R.* v. *Elliott,* 102 Fed. 96; affd. 184 U. S. 695; *Glaspie* v. *Keator,* 56 Fed. 203; *Hansel* v. *Purnell,* 1 F. (2d) 266; 266 U. S. 617; *Attorney General* v. *Pelletier,* 240 Mass. 264; *United States* v. *Carter,* 217 U. S. 286; *The New York,* 175 U. S. 187; *Kirby* v. *Talmadge,* 160 U. S. 379; *Buick* v. *United States,* 275 Fed. 809; *Hill* v. *United States,* 234 Fed. 39; *Gulf Ry.* v. *Ellis,* 54 Fed. 481; *Hyams* v. *Calumet Min. Co.,* 221 Fed. 529; *Weed* v. *Lyons Pet. Co.,* 294 Fed. 725; affd. 300 Fed. 1005; *Nelson* v. *New York,* 131 N. Y. 4; *Keller* v. *Gill,* 92 Md. 190.

The finding of bribery as one of the elements of fraud, is sustained by the proofs, and is not based on improper inferences or presumptions. Appellants' contention that an inference or conclusion cannot be based upon a rebuttable inference or presumption must be limited in its

application to rebuttable inferences and presumptions of law. This proposition must be limited to such inferences as that men are to be considered honest and faithful to their duties until some evidence is offered that the men concerned were not honest and faithful; that a man exercised ordinary care for his own safety and was not guilty of negligence until some evidence to the contrary is introduced, etc. The cases cited by the appellants are of this type. *United States* v. *Ross,* 92 U. S. 281; *Manning* v. *Insurance Co.,* 100 U. S. 693; *Looney* v. *Met. Ry. Co.,* 200 U. S. 480. But proved facts and circumstances, although disconnected, may support an inference or conclusion involving intermediate inferences and conclusions of fact. Unless this were so a very large portion of cases which must be proven, if at all, by circumstantial evidence would fail. And almost invariably, fraud and conspiracy cases must be proven by circumstantial evidence. The oft repeated statements of courts that a wide latitude must be allowed in the introduction of evidence and circumstances in fraud and conspiracy cases would otherwise be practically valueless. *Cooper* v. *United States,* 9 F. (2d) 216; *Dimmick* v. *United States,* 135 Fed. 257; *State* v. *Fiore,* 85 N. J. L. 311; *Hinshaw* v. *State,* 147 Ind. 334; Wigmore, Evidence, 2d ed., vol. 1, § 41.

The lease and contract are illegal. The real purpose of the lease was to provide fuel depots on the Atlantic Coast and to obtain for the benefit of the United States the construction of a pipe line to serve this dome and other territory of the United States not set apart for the use of the Navy.

The alleged severability of the lease and contract: This lease was made by officers of the United States who on its behalf purported to grant the lease on conditions and covenants made by the lessee as a consideration for that grant. One of those covenants was, and the officers who

made the lease required that it should be, that the lessee upon demand would build steel tankage in exchange for the royalty oil. From analysis of the lease and contract, we believe that this Court will conclude in this case, as it did in the *Pan American* case, that: " The contracts and leases and all that was done under them are so interwoven that they constitute a single transaction not authorized by law and consummated by conspiracy, corruption and fraud." It does not lie in the mouth of appellants to ask a court to rewrite the document and fasten upon the Government a lease wholly different from that which the officers of the Government attempted to make for it. *Hazleton* v. *Scheckells,* 202 U. S. 71; *McMullen* v. *Hoffman,* 174 U. S. 639; *Lingle* v. *Snyder,* 160 Fed. 627; *Western Ind. Co.* v. *Crafts,* 240 Fed. 1; *Townes* v. *Townes,* 270 Fed. 744; *Central R. R. of N. J.* v. *United Pipe Line Co.,* 290 Fed. 983; *Linebarger* v. *Devine,* 47 Nev. 67; *Orenstein* v. *Kahn,* 13 Del. Ch. 376; *LaFrance* v. *Cullen,* 196 Mich. 726; Williston, Sales, vol. 2, § 681; 13 C. J., § 471.

The making of the acquirement of the placer mining claims a part of the consideration was unlawful and voids the whole lease.

The award of the lease and contract without advertisement and competitive bidding was unlawful.

The lease and contract contemplated the erection of fuel depots not authorized by Congress.

The Sinclair Crude Oil Purchasing Company and Sinclair Pipe Line Company are not entitled to any modification of the decree of the Circuit Court of Appeals. These appellants participated in the violation of the public policy of the United States involved in the lease to Mammoth Oil Company. Parties to illegal contracts subversive of the public policy of the Government are not entitled to any equity or to any consideration or to the value of their improvements. *Causey* v. *United States,* 240 U. S. 339; *United States* v. *Trinidad Coal Co.,* 137 U. S. 160; *Heckman* v. *United States,* 224 U. S. 413.

MR. JUSTICE BUTLER delivered the opinion of the Court.

This suit was brought by the United States against the petitioners in the District Court of Wyoming to secure the cancelation of an oil and gas lease made by the United States to the Mammoth Oil Company April 7, 1922, and to set aside a supplemental agreement made by the same parties February 9, 1923. An accounting and possession of the leased lands and general relief were also demanded. The complaint alleged that the lease and agreement were made without authority of law and in consummation of a conspiracy to defraud the United States. The District Court held that the transaction was authorized by the Act of June 4, 1920, c. 228, 41 Stat. 812, 813, found that there was no fraud, and dismissed the case. 5 F. (2d) 330. The Circuit Court of Appeals sustained that construction of the Act; but on an examination of the evidence, held that the lease and agreement were obtained by fraud and corruption, reversed the decree and directed the District Court to enter one canceling the lease and agreement as fraudulent, enjoining petitioners from further trespassing on the leased lands and providing for an accounting by the Mammoth Oil Company for all oil and other petroleum products taken under the lease and contract. 14 F. (2d) 705.

The lease covered 9,321 acres in Natrona County, Wyoming—commonly known as Teapot Dome—being Naval Reserve No. 3 created April 30, 1915, by an executive order of the President made pursuant to the Act of June 25, 1910, c. 421, 36 Stat. 847, as amended August 24, 1912, c. 369, 37 Stat. 497. The part of the Act of June 4, 1920 relied on to sustain the lease contains the following: "*Provided,* That the Secretary of the Navy is directed to take possession of all properties within the naval petroleum reserves . . . to conserve, develop, use, and operate the same in his discretion, directly or by contract, lease, or otherwise, and to use, store, exchange, or sell the

oil and gas products thereof, and those from all royalty oil from lands in the naval reserves, for the benefit of the United States: . . . *And provided further,* That such sums as have been or may be turned into the Treasury of the United States from royalties on lands within the naval petroleum reserves prior to July 1, 1921, not to exceed $500,000, are hereby made available for this purpose until July 1, 1922."

March 5, 1921, Edwin Denby became Secretary of the Navy and Albert B. Fall, Secretary of the Interior. May 31, 1921, the President made an order purporting to commit the administration of all oil and gas bearing lands in the naval reserves to the Secretary of the Interior, subject to the supervision of the President. The lease and agreement were signed for the United States by Fall as Secretary of the Interior and by Denby as Secretary of the Navy. The evidence shows that the latter was fully informed as to the substance of the transaction, and it is not necessary here to consider the validity or effect of the executive order.

The purpose and scope of the lease and agreement may be indicated by a statement of their principal features. The preamble to the lease stated that it was the duty of the Government to secure and store oil for the Navy; that the Government desired to avoid the loss of oil resulting from the drilling of wells outside the reserve, to create a market and receive the best prices obtainable for royalty oil from the Salt Creek field [adjoining the reserve on the north], to exchange royalty oil from the reserve for fuel oil for the Navy and to secure facilities for the storage of such fuel oil; and that the Government proposed to secure these objects by entering into a contract providing for the development and exploitation of the oil and gas within the reserve and for the construction of a pipe line, if necessary, for the transportation of royalty oil from the reserve and from the Salt Creek field,

The lease granted to the company the exclusive right to take and dispose of oil and gas so long as produced in paying quantities. The lessee agreed to drill test wells and, after their completion, fully to develop the reserve, to construct, or cause its nominee to construct, a common carrier pipe line [about 1,000 miles in length] from the leased lands to a line from the mid-continent field to Chicago; to pay as royalties specified percentages of products taken from the land; to purchase all royalty oil when and as produced, and in payment to set up an oil exchange credit to the lessor and issue certificates showing the amount and value of royalty oil received by lessee. It was provided that lessee would redeem the certificates by giving lessor credit on its obligations to lessee for the construction of tanks to store fuel oil for the Navy under the agreement contained in the lease for the exchange of crude oil for fuel oil storage, or by delivering to lessor fuel oil or other products of petroleum for the use of the Navy, or by cash under certain conditions. And it was agreed that the lessee, when requested by the lessor, would construct or pay the cost of constructing steel tanks necessary for such storage; that lessor would pay in oil certificates of face value equal to such cost; that in exchange for crude oil lessee would deliver fuel oil and other petroleum products for the Navy at places * on the Atlantic Coast, the Gulf of Mexico, and at Guantanamo Bay, Cuba. Lessee agreed diligently to drill and continue operation of oil wells unless by the Secretary of the Interior

---

| | | |
|---|---|---|
| * Houston, Tex. | Boston, Mass. | Norfolk, Va. |
| Pensacola, Fla. | Melville, R. I. | Philadelphia, Pa. |
| New Orleans, La. | Woods Hole, Mass. | Bath, Me. |
| Charleston, S. C. | New Haven, Conn. | Rockland, Me. |
| Annapolis, Md. | Guantanamo Bay, Cuba. | Quincy, Mass. |
| Indian Head, Md. | Key West, Fla. | Block Island, R. I. |
| New York, N. Y. | Mobile, Ala. | New London, Conn. |
| Machias, Me. | Washington, D. C. | Bridgeport, Conn. |
| Portsmouth, N. H. | Baltimore, Md. | Fall River, Mass. |

permitted temporarily to suspend operations. And it was provided that, with the consent of the Secretary of the Interior, the lease might be terminated. By a separate agreement dated December 20, 1922, the lessee designated, and the lessor accepted, the Sinclair Pipe Line Company as the nominee of lessee to construct the pipe line, having a daily capacity of 40,000 barrels.

The supplemental agreement of February 9, 1923, relates to storage tanks to be provided by the lessee. It deals with four projects covering construction work at Portsmouth, Melville, Boston and Yorktown. The total capacity—some expressed in tons and some in gallons—to be constructed at these places was sufficient to store 2,550,000 tons of fuel oil, 37,500 tons and 625,000 gallons of Diesel oil, 26,500 tons and 2,330,000 gallons of gasoline, 13,800 tons and 1,161,000 gallons of lubricating oil. The lessee agreed to provide the tanks and fill them in exchange for royalty oil certificates. The Government was not obligated to lessee otherwise than to deliver it oil certificates for redemption in accordance with the lease, and until the agreement was fully performed all certificates received by the Government were to be used for constructing and filling storage for fuel oil and other petroleum products. And it was further provided that upon completion of these projects other facilities for the storage of petroleum products required by the Navy were to be constructed and filled by the lessee.

The evidence shows that the storage facilities to be furnished under the lease were to be complete reserve fuel stations, such as are known in the Appropriation Acts as " fuel depots "; that the arrangement to use royalty oil to pay for such construction was made for the purpose of evading the requirement that the proceeds of the royalty oil, if sold, be paid into the Treasury, and to enable the Secretary of the Navy to locate, plan and have constructed fuel stations that had not been authorized by

83583°—28——3

Congress; that the approximate cost of construction so to
be done on the Atlantic Coast would be at least $25,-
000,000, of that on the Pacific under arrangement with
the Pan American Petroleum and Transport Company
$15,000,000, and for the whole program—including the
products to be put into these fuel depots when con-
structed—a little in excess of $100,000,000. The cost of
the pipe line is not included in any of these figures. It
was not deemed to be a facility merely for the develop-
ment of the reserve; but was desired by those acting for
the Government for the transportation of oil obtained in
that part of the country, to create competition in the oil
market, and as an instrumentality for national defense in
case of war.

A construction of the Act authorizing the agreed dis-
position of the reserve would conflict with the policy of
the Government to maintain in the ground a great reserve
of oil for the Navy. Joint Resolution, approved Feb-
ruary 8, 1924, 43 Stat. 5. It would restore to the Secre-
tary of the Navy authority, of which he had recently
been deprived, to construct fuel depots without ex-
press authority of Congress. Act of August 31, 1842,
5 Stat. 577, (R. S. § 1552); Act of March 4, 1913, 37
Stat. 891. It would put facilities of the kind specified
outside the operation of the general rule prohibiting the
making of contracts of purchase or for construction work
in the absence of express authority and adequate appro-
priations therefor. R. S. §§ 3732, 3733; Act of June 12,
1906, 34 Stat. 240, 255; Act of June 30, 1906, 34 Stat.
697, 764. It would be inconsistent with the principle
upon which rests the law requiring purchase money re-
ceived on the sale of government property to be paid into
the Treasury. R. S. §§ 3617, 3618. While, in order to make
the petroleum products available for the Navy, the Act
deals with reserve lands as a separate class, there is
nothing to indicate a legislative purpose to reverse the

policy of conservation or to relax the safeguards as to fuel depots and contracts for their construction, set by prior legislation. The authority to " store " or to " exchange " does not empower the Secretary of the Navy to use the reserves to regulate or affect the price of oil in the Salt Creek field or to induce or aid construction of a pipe line to serve that territory. And it does not authorize the Secretary to locate the fuel stations provided for or to use the crude oil to pay for them. The Mammoth Oil Company insists that, even if other elements be held unauthorized, the transaction may be sustained as a lease granting the right to take the oil and gas in consideration of the development of the property and delivery of the royalty oils or the equivalent in cash. That view cannot prevail. The percentages of the product to be retained by the lessee includes the consideration, however indeterminate in amount, for the construction of the pipe line. Presumably, the lessee's undertaking to provide it induced the lessor to accept less than otherwise would have been asked or given. Cf. *Hazelton* v. *Sheckells*, 202 U. S. 71.

So far as concerns the power under the Act of June 4, 1920 to make them, the lease and agreement now before the court cannot be distinguished from those held to have been made without authority of law in *Pan American Petroleum and Transport Company* v. *United States*, 273 U. S. 456. And the United States is entitled to have them canceled.

Were the lease and supplemental agreement fraudulently made?

The decisions below are in conflict, and we have considered the evidence to determine whether it establishes the charge. The complaint states that the lease and agreement were made as the result of a conspiracy by Fall and H. F. Sinclair to defraud the United States; that Fall acted for the United States and Sinclair acted for

the Mammoth Oil Company; that the negotiations were secret and the lease was made without competition; that responsible persons and corporations desiring to obtain leases were by Fall in collusion with Sinclair denied opportunity to become competitors of the Mammoth Company; that a company known as the Pioneer Oil Company asserted a mining claim to lands in the reserve; that the claim was worthless and known to be so by Fall; that he had Sinclair procure a quitclaim deed covering the valueless claim and, then, to make it impossible for others to compete with Sinclair's company, Fall made its transfer condition the granting of the lease; that Fall agreed with one Shaffer that Sinclair would cause a part of the leased lands to be set aside for the benefit of Shaffer, and required Sinclair, in order to get the lease for the Mammoth Company, to agree that Shaffer should have a sublease on some of the land; that before and after the making of the lease Fall kept the negotiations and execution secret from his associates, the Congress and the public. And, in general terms, the complaint charges that Fall and Sinclair conspired to defraud the Government by making the lease without authority and in violation of law and to favor and prefer the Mammoth Company over others.

As is usual in cases where conspiracy to defraud is involved, there is here no direct evidence of the corrupt arrangement. Neither of the alleged conspirators was called as a witness. The question is whether the disclosed circumstances prove the charge. When Fall became Secretary, Reserve No. 3 had already attracted the attention of oil operators. His predecessor, Secretary Payne, had arranged to offer highest bidders 15 leases in the Salt Creek field. These covered areas ranging from 160 to 640 acres, amounting in all to 6,400 acres. The royalties averaged 28.76 per cent. June 15, 1921, the leases were auctioned. Bonuses offered in excess of the

specified royalties amounted in all to $1,687,000, and the leases were granted on that basis. That field was very productive. The reserve compared favorably with it, and was considered very attractive by all having knowledge of the structure. Obviously oil men would be interested in the opening of the reserve and the putting of its product on the market.

From the beginning Fall was keen to control the leasing of the naval petroleum reserves. Commander H. A. Stuart had been put in charge of naval reserve matters by Secretary Daniels; he continued as special aide to Denby, and was well qualified for that service. Early in April, 1921, Fall asked Assistant Secretary Edward C. Finney, who had long been in the Interior Department, to suggest someone who could handle naval reserve matters. Finney recommended, and Fall appointed, Doctor W. C. Mendenhall of the Geological Survey. Early in May, Fall had a memorandum prepared by Finney to disclose what power or authority in respect of the reserves could be delegated to Fall. Finney reported that the President might commit to the Secretary of the Interior the authorization of such additional wells or leases within the naval reserves as the President by § 18 of the Leasing Act was empowered to permit or grant; that under the Act of June 4, 1920, the Secretary of the Navy might request him to handle the conservation, development and operation of the naval reserves. And May 11, Fall sent Denby a letter inclosing for his approval a draft of a proposed executive order and a form of letter addressed to the President to be signed by Denby, requesting that the order be made. Fall said: " Referring to our conversation yesterday, and to your suggestion to the President that the Secretary of the Interior be placed in charge of administration of the laws relating to naval reserves, I am submitting herewith for your consideration a brief memorandum stating the facts and law with respect to naval reserves, a tentative form

of letter for your signature if it meets with your approval, and a form of Executive order for the President's signature if it meets your suggestions of yesterday . . . If they meet with your approval and no changes occur to you, kindly return them with your approval, in order that the matter may be taken up with the President." While this letter contains language calculated to indicate that Denby initiated the matter, the context and attending facts clearly show that Fall was eager to get the authority proposed to be given him.

Denby was not called as a witness, but the circumstances indicate that he intended to be passive and let Fall dominate. He sent Fall's form of executive order to Assistant Secretary Roosevelt and the Chief of the Bureau of Engineering, Admiral R. S. Griffin. After consideration of the matter by them and other officers of the Navy, including Commanders Stuart, J. F. Shafroth and E. A. Cobey, the Assistant Secretary told Denby that he thought that the property should not be turned over to the Interior Department. Denby replied that the matter had been decided by the President, Fall and himself. Later the Assistant Secretary took to Denby a suggestion, prepared by him and his associates, for the amendment of the proposed order. Denby said: " If you can get Fall to agree to this modification, then it will be all right with me." Fall agreed to the change, and the President signed the form of order as amended. Its pertinent provisions follow: " The administration and conservation of all oil and gas bearing lands in naval petroleum reserves . . . are hereby committed to the Secretary of the Interior subject to the supervision of the President, *but no general policy as to drilling or reserving lands located in a naval reserve shall be changed or adopted except upon consultation and in coöperation with the Secretary or Acting Secretary of the Navy.*" We italicize words added as a result of the suggestion of Denby's subordinates. The executive

order as signed by the President was what Fall wanted and, so far as concerns the matters here involved, it was not substantially different from the draft he submitted to Denby.

Soon after the order was made, 22 offset wells in Reserve No. 1 were given to companies represented by E. L. Doheny and one McMurray, respectively. In connection with that matter Fall had some trouble with Mendenhall and Stuart and expressed himself as " dissatisfied with both of them." Thereafter, neither of them was given anything to do in respect of reserve leases. July 8, 1921, Fall wrote Doheny a letter containing the following: " There will be no possibility of any further conflict with Navy officials and this Department, as I have notified Secretary Denby that I should conduct the matter of naval leases, under the direction of the President, without calling any of his force in consultation unless I conferred with himself personally upon a matter of policy. He understands the situation and that I shall handle matters exactly as I think best and will not consult with any officials of any bureau of his department, but only with himself, and such consultation will be confined strictly and entirely to matters of general policy." This exultant declaration that he was in position to handle these vast properties as he pleased discredits Fall. His desire to get control of the reserves and then so proclaim that he had it strongly suggests that he was willing to conspire against the public interest. And that inference is confirmed by his subsequent conduct.

By letter to Denby of July 23, Fall suggested the thought that royalty oil might be used to pay for fuel depots to be located and planned by the Navy. That idea seems not to have originated in the Navy. Such use of royalty oil was an essential element in any arrangement involving the prompt exhaustion of the reserves. It was the foundation of the scheme culminating in the lease. Denby by letter to Fall of July 29 indicated his

acquiescence. Soon thereafter Fall left Washington for the West, declaring that he was going to discuss the matter with oil men " with the idea of working up some such arrangement." He returned about the middle of October. In the meantime Admiral John K. Robison was appointed to succeed Admiral Griffin as Chief of the Engineering Bureau. Denby directed Robison to take personal charge of all naval petroleum matters. Commander Stuart was relieved from all duties in reference to them. The record shows no reason for the removal of Stuart, but it does appear that Fall favored the change and that Denby knew it.

Immediately after he was given charge, Robison investigated and found that Reserves Nos. 1 and 2 were suffering loss from drainage and that Reserve No. 3 was not. He testified that he thought the latter pretty secure but not absolutely so. He read Fall's letter of July 23, suggesting the use of royalty oil to pay for storage tanks, and he made working arrangements with Fall, which were confirmed by a letter of October 25, prepared by Robison and signed by Denby and sent to Fall. They agreed that Fall was to control the making of all leases for the drilling of wells in the naval reserves and for the disposition of the products; that he would have necessary offset wells drilled in Reserves Nos. 1 and 2, but that the development of Reserve No. 3 would not be undertaken except to protect it against depletion by others; that the Navy was to receive fuel oil for royalty oil; that so much of the royalty oil as was not exchanged for fuel oil would be used to obtain storage at places to be designated by the Navy; and that the terms of the conversion should be submitted to the Navy for approval as to qualities, deliveries, engineering and other features involved.

Denby did not actively participate; but, in conferences with Fall, he was represented by Robison. Fall personally conducted the negotiations with Sinclair. And

he contemporaneously arranged with Doheny the contract that was set aside for fraud in the *Pan American Case, supra.*  Under the Secretary, Finney usually acted for the United States in making oil and gas leases, and he was authorized to sign them.  But he was not consulted as to the terms of the naval reserve leases made to the Mammoth Company represented by Sinclair or to the Pan American Petroleum and Transport Company represented by Doheny.  Robison through Fall undoubtedly exerted influence as to the provisions for the pipe line and fuel stations, but Fall acted for the United States and dominated in all matters substantially affecting the value of the lease.  And it is significant that by the terms of the lease the Secretary of the Interior was authorized to permit the lessee temporarily to suspend production or to assign or terminate the lease.

November 30, at a meeting of the Secretary's Council, consisting of important officers in the Navy, Robison advised, and it was decided, that the oil reserves should not be used to supply fuel oil for current use.  He urged that leases be made and royalty oil exchanged for fuel oil and storage constructed by the lessees at places to be designated by the Navy.  Denby at first queried whether the exchange was authorized by law, and Robison called for the advice of the Judge Advocate General of the Navy.  He answered affirmatively and, in the course of his opinion, said: " The authority granted ' to exchange ' is unrestricted; i. e. the Act does not specify nor limit what may be taken in exchange for the oil and its products."  Denby approved the opinion and authorized the proposed exchange.  Robison prepared a letter which Denby signed and sent to Fall, quoting the Judge Advocate General, and stating that Denby desired the Interior Department to make exchanges of crude oil for fuel oil and storage and that Robison had been designated to handle the details.

Then Fall went to his ranch at Three Rivers, New
Mexico, where, December 31, came Sinclair and his
counsel, J. W. Zevely, to see him—as the latter testified—
on some business connected with Osage Indian leases.
They remained two days. The showing as to what trans-
pired concerning the Teapot Dome is meager. The
record contains no statement from Fall or Sinclair. H. F.
Bain, Director of the Bureau of Mines, was there for a
day, but the leasing of the reserve was not mentioned in
his hearing. Zevely testified that he was not sure
whether the subject was mentioned in his presence; but he
thought inquiry was made of Fall as to whether he would
lease the Teapot Dome and that Fall said he was having
an investigation made " and upon that report he would
probably determine whether or not he would lease " it.
Nothing more is directly disclosed. But, soon after Fall
and Sinclair met at the ranch, Fall caused his office force
to investigate pending claims to land in the reserve
and directed a report to be made to him on his return.
Evidently he was considering leasing the reserve as a
whole.

Fall reached Washington January 27 and, after confer-
ence with Robison, it was decided to develop all of Re-
serve No. 3. He sent for Sinclair and Zevely and had
Robison tell them what would be necessary in any pro-
posal for a lease. Robison told Sinclair that the whole
reserve should be developed, that a pipe line adequate to
serve the field should be constructed, and that royalty oil
should be used to obtain fuel oil and to pay for storage
facilities. And February 3, Sinclair wrote to Fall, stating
that he was willing to take out all the oil in the reserve
on a royalty basis and specifying features substantially
the same as those suggested to him by Robison. He also
proposed to quiet all outstanding claims and so enable the
Government to make one lease covering the whole reserve.
His letter argued against granting leases by auction, as-

serted that the reserve was being drained, and insisted that it was better to have oil stored where needed than to keep the reserve underground. On receipt of the letter, Fall conferred with Sinclair and directed Arthur W. Ambrose, chief petroleum technologist of the Department, to give him an estimate of the quantity of oil in the reserve and " some idea as to the possibilities of drainage." February 18, Ambrose reported that he estimated 360,270,000 barrels in the Salt Creek field and 135,050,000 barrels in the reserve. His report disclosed no immediate danger of drainage but only a possibility of loss " during the next six or seven years." About that date Fall called Ambrose into his office where Sinclair and Zevely were and, outlining certain provisions he wanted, directed that a draft of lease be prepared. The work of preparation required two or three weeks, and most of it was done in Zevely's office in Washington. Questions concerning its provisions arising from time to time were referred to Fall and Sinclair; they settled all the terms of the lease. The draft was not submitted to any lawyer in the Interior Department.

The Pioneer Oil and Refining Company and the Societe Belgo-Americaine des Petroles du Wyoming had asserted placer mining claims to lands in the reserve. In 1917, the Department fully investigated and found these claims were without merit. In 1920, Secretary Payne held them invalid and denied application for a lease. In March, 1921, Assistant Secretary Finney dismissed claimants' petition for rehearing. Later, they filed a petition to invoke the supervisory power of the Secretary. Answering an inquiry from Fall, Finney told him that the claims " had no validity and no standing." The last petition had not been heard when Fall and Sinclair met at the ranch. The report that Fall called for was ready before he returned to Washington; it stated that there were no claims deserving serious consideration. Obviously Sinclair's pro-

posal to quiet outstanding claims was the result of an understanding with Fall.

February 28, 1922, Sinclair caused the Mammoth Company to be organized. It promptly obtained from the Pioneer and Belgo companies quitclaim deeds of all the reserve lands, and agreed with them that, in the event of obtaining a lease covering the lands, it would pay them $200,000 within 18 months and $800,000 more out of one-third of the value of the gross production less royalties. March 11, Sinclair wrote Fall submitting the Mammoth Company's formal application for a lease. He said that, if the lease were granted, he would become owner of all the capital stock of the company and would personally guarantee performance of the contract. He submitted a form of lease—presumably that already prepared in coöperation with Fall—and inclosed the company's quitclaim deed to the United States of all that was conveyed to it by the Pioneer and Belgo companies. The record shows that, after he knew that the Mammoth had obtained these deeds, Fall told some who sought to lease the reserve that he would require the lessee to satisfy or clear up outstanding claims. In March, after much time had been spent in preparing the lease, Fall told a representative of a company seeking a lease that he was not ready at that time to consider leasing the reserve and that, if he did so decide, he would notify the applicant. To one acting for another company, who called about April 10 to submit an offer for a lease, Fall indicated that he would entertain a bid and said that he would be glad to see representatives of the company at Three Rivers. The lease had been signed by Fall April 7.

March 16, 1922, John C. Shaffer called on Fall concerning an earlier application for a lease covering a specified tract of 600 acres in the reserve. Fall said he was then negotiating with Sinclair for a lease covering the reserve. Shaffer insisted upon having some of it; and Fall said he had told Sinclair to set aside 200 acres for Shaffer. And

when Shaffer demanded more,· Fall advised him to see Sinclair, adding, "I think you will find him a very reasonable man, and you probably will make satisfactory arrangements with him." Shaffer went to New York and saw Sinclair. The latter said that Fall had told him to reserve 200 acres for Shaffer. Shaffer demanded 600 acres, protracted negotiations between them followed, and it does not appear that any agreement was ever reached. Fall's arrangement with Sinclair for a sublease to Shaffer was extraordinary and indicates that he had favored the Mammoth Company and that Sinclair on that account had assumed obligations not expressed in the lease.

About March 30 a rough draft of the lease was given Robison. April 7, Fall signed as Secretary of the Interior and "for the Secretary of the Navy." It was thought desirable, whether necessary or not, that Denby should sign; and, about April 12, he did so. Then Fall, about to leave for New Mexico, told Finney that the lease had been executed, and locked it and copies in his desk. He said that ".he didn't want it to get out" until after the consummation of the contract (that set aside in the *Pan American* case) for the construction of storage tanks, etc., at Pearl Harbor. He wrote Denby inclosing a copy and stating that delivery of the lease had been made to the lessee; that he had instructed his office force to give out nothing; that he was particularly anxious that no details should be disclosed pending the completion of the other contract. And, in order to support his refusal to furnish a senator information concerning these contracts, Fall insisted that they should not be given out because military plans were involved. After Fall left, inquiries were made at the Department, but all information was withheld. When demand became more insistent, Fall wired his office to notify Sinclair to furnish a surety company bond "in view of congressional agitation" instead of Sin-

cláir's personal bond theretofore accepted. About April 21, information concerning the lease was given in response to a Senate resolution. There was never any legitimate reason for secrecy.

The Mammoth Company insists that the lease was made to protect the reserve from loss by drainage. The trial court did not pass upon the matter. The Circuit Court of Appeals found there was a remote but not immediate danger. It said (p. 719): "The drainage danger was unquestionably not imminent enough to force immediate action in the leasing of the entire property." That fact is satisfactorily established. A discussion of the evidence is not necessary. The circumstances, terms of the arrangement and testimony of witnesses show that the lease and agreement were not made to prevent drainage. While the negotiations were pending, Fall and Sinclair indicated that they thought such danger existed, but the evidence warrants a finding that their expressions were made in bad faith to make it appear that there was a reason for the exhaustion of the reserve and the proposed disposition of its products.

In January, 1922, Fall was informed that counsel for certain oil companies had held that the use of royalty oil to pay for fuel depots was not authorized by law. He expressed fear that, because of the " question as to the legality of bartering of royalty oil for storage, people would not bid for this contract and lease in California." But he refused to submit the question to the Attorney General; and, as a reason for not taking such legal advice, said that " the chances were at least even, or at least there was some chance " that an adverse opinion would be given " and if the Attorney General signed such an opinion . . . . he [Fall] would be estopped from doing anything." And, on April 12, the day that Denby signed the lease, Fall asked him to procure the adoption of an amendment to the pending naval appropriation bill, providing

that storage for fuel oil from the reserves might be obtained by exchange of oil or by use of cash received for royalty oil sold. Fall sent Denby a draft of the amendment and undoubtedly thought its adoption would authorize the exchange of oil for the storage facilities contemplated by the lease. Under the circumstances, his failure to submit the lease to the Attorney General or to any lawyer in his own Department indicates that he knew that the transaction was liable to be condemned as illegal, and that, without regard to the law, he intended to put it through.

Shortly after the making of the lease, Fall received from a hidden source a large amount of Liberty Bonds, and others were used for his benefit. The substance of the disclosed circumstances follows. A. E. Humphreys controlled two oil producing companies. H. M. Blackmer was chairman of the board of the Midwest Refining Company, a subsidiary of the Standard Oil Company of Indiana. The latter and the Sinclair Consolidated Oil Corporation owned share and share alike the Pipe Line Company and Purchasing Company. November 15 [1921], Humphreys, his counsel Charles S. Thomas, Blackmer, Sinclair, and James E. O'Neil, president of the Prairie Oil and Gas Company, met in New York. It was there understood that Humphreys' companies would sell to Blackmer at $1.50 a barrel half their production up to 33,333,333 barrels, and also that they would sell at prices current in the field to the Prairie Company and the Purchasing Company half the production after delivery of the oil so sold to Blackmer. The same persons and R. W. Stewart, president of the Standard Oil Company of Indiana, met the next day. It was then understood that, instead of Blackmer, the Continental Trading Company Ltd. would be the purchaser in the first transaction and that performance on its part would be guaranteed by the Prairie Company and the Purchasing Company. The

papers were so drawn. On the same day, Henry Smith Osler, a barrister of Toronto, caused application to be made to the Secretary of State for Canada for the incorporation of the Continental Company. The next day, he attended a meeting of the same persons and executed the contract on behalf of that company. Its performance was guaranteed as arranged, O'Neil acting for the Prairie Company and Sinclair and Stewart for the Purchasing Company. At the same time the Continental Company and these guarantors made a contract by which the latter bought all the oil so purchased by the Continental Company and assumed all its obligations. On the price basis specified, the gain of the Continental would be at least 25 cents per barrel and under some circumstances might be more. The Continental was to receive payments for the oil on the tenth of each month, but was not bound to pay the producers before the fifteenth. So it was assured profit of at least 25 cents per barrel without financing or effort of any kind. As permitted by Canada law, it issued share warrants to bearer with dividend coupons attached; except for qualifying shares, it put out no stock, did no other business, and kept no accounts. All its financial transactions were handled by the New York agency of the Dominion Bank of Canada. There was found no record disclosing who were financially interested in the company or entitled to dividends paid by it. Pursuant to Osler's instructions, the New York agency on April 13 and April 17, 1922, bought Liberty Bonds of $300,000 par value; and, on May 8 following, Osler as president of the Continental Company gave the agency a receipt for Liberty Bonds of that amount. There were other similar transactions; and, between February 1922 and June 1923, like purchases and deliveries amounted to more than $3,000,-000. In May, 1923, the Continental Company assigned its contract with the Humphreys' companies to its guarantors for $400,000. Shortly afterwards, it was dissolved, and all its records were destroyed.

May 29, 1922, at Pueblo, Colorado, Fall's son-in-law, M. T. Everhart, had $230,500 in Liberty Bonds. Of that amount, $200,000 were, by the numbers thereon, conclusively shown to have been included in the lots purchased by the New York agency, April 13 and April 17, and receipted for by Osler, May 8. Everhart gave the First National Bank of Pueblo bonds for $90,000 to be kept for Fall. He sold the balance to the M. D. Thatcher Estates Company at par and accrued interest. Fall and Everhart owned all the stock of the Tres Ritos Cattle and Land Company. The Thatcher Company had loaned the cattle company $10,000, Fall $15,000, and Everhart $83,000, and for security held all the stock of that company. Out of the proceeds of the bonds, Everhart paid these debts. The balance was distributed to the company, Fall, and Everhart. Out of the $90,000 in bonds given to the bank for Fall, $20,000 were deposited to the credit of the cattle company, and the rest was sent to Fall. In October and November, 1922, he sold $20,000 in Texas; and, in May, 1923, $50,000 in New Mexico. The Government called Everhart as a witness; but, invoking the rule against compulsory self-incrimination, he declined to give any information as to where he got the bonds.

Humphreys and his counsel testified but were unable to disclose who were financially interested in the Continental Company. Blackmer and O'Neil went to France; and, on the application of the Government, letters rogatory issued, but they refused to testify. Subpoena was issued for Stewart, but the marshal returned that he could not be found. Commissioners were appointed to take the deposition of Osler in Canada. He was sworn, but declined to disclose who caused him to organize the Continental Company or to give information as to its owners or the distribution of its assets. As ground for the refusal, he asserted that the information called for was privileged because communicated to or obtained by him in the course

83583°—28——4

of his employment as a professional legal advisor, and that the company and its officers were his confidential agents for the better performance of his duties to his client. Application was made to the Supreme Court of Ontario to compel him to testify. That court held he must answer, 56 O. L. R. 307; and its judgment was affirmed on appeal. 56 O. L. R. 635. The District Court, on defendants' objections, refused to delay the trial pending final decision in the Canada courts and thereafter refused to reopen the case in order to get Osler's testimony.

The creation of the Continental Company, the purchase and resale contracts enabling it to make more than $8,000,000 without capital, risk or effort, the assignment of the contract to the resale purchasers for a small fraction of its probable value, and the purpose to conceal the disposition of its assets make it plain that the company was created for some illegitimate purpose. And the clandestine and unexplained acquisition of these bonds by Fall confirms the belief, generated by other circumstances in the case, that he was a faithless public officer. There is nothing in the record that tends to mitigate the sinister significance attaching to that enrichment.

Fall ceased to be Secretary, March 4, 1923. Shortly afterwards, Sinclair gave him $25,000 under these circumstances. Sinclair, about to go to Russia on business, had Zevely arrange with Fall to meet him there. Fall was given $10,000 for expenses; and, May 26, 1923, Sinclair directed his secretary, Wahlberg, to give Zevely bonds for $25,000 if the latter asked for them. A few days later, Zevely obtained the bonds and, at Fall's request, had them sent to the First National Bank of El Paso. Zevely wrote the bank that the package belonged to Fall. By direction of Fall, the bank sold the bonds and gave him credit for the proceeds, $25,671.36. Zevely testified concerning the transaction before the Senate Committee on Public Lands, and that testimony was introduced at the trial by the

defendants. Its substance was that Zevely went to New Mexico to see Fall because he did not want to write about the matter; that, in addition to the expense money, Fall wanted $25,000 to buy one or two small ranches there; that Zevely so reported to Sinclair, who said: " If he does, you will have to let him have it "; that later Zevely had Wahlberg, who did not know the bonds were for Fall, send them to the designated bank; that the bonds were not given as a fee but as a loan from Sinclair; that, after Fall's return from Russia, he gave Zevely a note for $25,000 which the latter still held. Fall allowed the proceeds of the bonds to remain in the bank for a long time, and it does not appear that he ever bought the ranches. It is obvious that this was not a straightforward transaction. Coming so soon after the supplemental agreement made to perfect and carry out the scheme, it strengthens and confirms the inference that Fall had been willing to conspire to defraud the United States; and, taken in connection with other circumstances disclosed, it is persuasive evidence of such a conspiracy between him and Sinclair.

Familiar rules govern the consideration of the evidence. As said by Lord Mansfield in *Blatch* v. *Archer* (Cowper 63, 65): " It is certainly a maxim that all evidence is to be weighed according to the proof which it was in the power of one side to have produced, and in the power of the other to have contradicted." The record shows that the Government, notwithstanding the diligence reasonably to be expected, was unable to obtain the testimony of Blackmer, O'Neil, Stewart, Everhart, or Osler in respect of the transaction by which the Liberty Bonds recently acquired by the Continental Company were given to and used for Fall. And the record contains nothing to indicate that the petitioners controlled any of them, or did anything to prevent the Government from obtaining their testimony, or that they or the evidence they might have given was within petitioners' power. But the failure of

Sinclair to testify stands on a different basis. Having introduced evidence which, uncontradicted and unexplained, was sufficient to sustain its charge, the United States was not required to call the principal representative of the company. His silence makes strongly against the company. It is as if he personally held the lease, were defendant, and failed to testify. The guiding considerations by which the proper significance of such silence is to be ascertained were well stated by Chief Justice Shaw in the celebrated case of *Commonwealth* v. *Webster*, 5 Cush. 295, 316: "Where, for instance, probable proof is brought of a state of facts tending to criminate the accused, the absence of evidence tending to a contrary conclusion is to be considered,—though not alone entitled to much weight; because the burden of proof lies on the accuser to make out the whole case by substantive evidence. But when pretty stringent proof of circumstances is produced, tending to support the charge, and it is apparent that the accused is so situated that he could offer evidence of all the facts and circumstances as they existed, and show, if such was the truth, that the suspicious circumstances can be accounted for consistently with his innocence, and he fails to offer such proof, the natural conclusion is, that the proof, if produced, instead of rebutting, would tend to sustain the charge. But this is to be cautiously applied, and only in cases where it is manifest that proofs are in the power of the accused, not accessible to the prosecution." While Sinclair's failure to testify cannot properly be held to supply any fact not reasonably supported by the substantive evidence in the case (*Northern Railway Company* v. *Page*, 274 U. S. 65, 74), it justly may be inferred that he was not in position to combat or explain away any fact or circumstance so supported by evidence and material to the Government's case. *Runkle* v. *Burnham*, 153 U. S. 216, 225; *Kirby* v. *Tallmadge*, 160 U. S.

379, 383; *Bilokumsky* v. *Tod,* 263 U. S. 149, 154; *Vajtauer* v. *Commissioner of Immigration,* 273 U. S. 103, 111; *Clifton* v. *United States,* 4 How. 242, 247; *Missouri, K. & T. Ry. Co.* v. *Elliott,* 102 Fed. 96, 102. As to facts appearing to have been within the knowledge or power of Sinclair, we find that the evidence establishes all that it fairly and reasonably tends to prove.

The complaint did not allege bribery; and, in the view we take of the case, there is no occasion to consider and we do not determine whether Fall was bribed in respect of the lease or agreement. It was not necessary for the Government to show that it suffered or was liable to suffer loss or disadvantage as a result of the lease or that Fall gained by or was financially concerned in the transaction. *Pan American* case, *supra,* p. 500. It requires no discussion to make it plain that the facts and circumstances above referred to require a finding that pending the making of the lease and agreement Fall and Sinclair, contrary to the Government's policy for the conservation of oil reserves for the Navy and in disregard of law, conspired to procure for the Mammoth Company all the products of the reserve on the basis of exchange of royalty oil for construction work, fuel oil, etc.; that Fall so favored Sinclair and the making of the lease and agreement that it was not possible for him loyally or faithfully to serve the interests of the United States or impartially to consider the applications of others for leases in the reserve, and that the lease and agreement were made fraudulently by means of collusion and conspiracy between them.

The lease gave the Mammoth Company the right to construct tanks and other operating facilities on the reserve. In January 1923, the petitioner, Sinclair Crude Oil Purchasing Company, bought from that company the tanks already constructed and others being built thereon. It used them to store Salt Creek royalty oil that it bought

from the Government. It claims that it relied on the validity of the lease and became the owner of the tanks as licensee and grantee of the lessee and entitled to maintain them in all respects as the lessee was entitled to do under the lease. It contends that the Circuit Court of Appeals erred in directing it to be restrained from further trespassing upon the reserve, and that in any event it should be given opportunity to remove its property. But the Purchasing Company is presumed to have known that no law authorized the making of any such lease. The existence of that arrangement for the exhaustion of the reserve was calculated to excite the apprehensions of one considering such a purchase and put him on his guard rather than to give assurance of safety. The use of such tanks to take oil from the reserve was a part of the illegal scheme. Moreover, the Purchasing Company was owned half and half by the Sinclair Consolidated Oil Corporation and the Standard Oil Company of Indiana. Sinclair was chairman of the board of the former, and Stewart held like position in the latter. Shortly before the Purchasing Company bought the tanks, these chairmen acted for and controlled it in respect of most important transactions. That and other disclosed circumstances are sufficient to impute to it Sinclair's knowledge of the conspiracy to defraud by which the lease was obtained. It is clear that, in respect of the use and removal of these tanks, the Purchasing Company is in no better position than the Mammoth Company would have occupied, if it owned them.

The Sinclair Pipe Line Company, as lessee's nominee to build the pipe line provided for in the lease, expended a large amount in constructing on the reserve a pumping station, pipe line and other equipment necessary for the transportation of the oil therefrom. It asserts that it relied on the validity of the lease, had no knowledge of

any fraud in its procurement and made these expenditures in good faith. It contends that it should have opportunity to procure from governmental authorities a right to use the reserve lands for the operation of the pipe line and equipment thereon; and, failing to get a right of way or easement for that purpose, it should be allowed to remove its property. That company was also owned half and half by the Consolidated Company and the Standard Company. It was a mere nominee to do some of the work specified in the lease to be performed by the lessee. It is chargeable with notice that the use of reserve oil to procure the construction of the pipe line was a part of the plan for the unauthorized exhaustion of the reserve; that such use furthered the violation of law and was contrary to the established conservation policy. The Pipe Line Company stands on no better ground than the lessee would have occupied if it had made the improvements in question.

The tanks, pipe line and other improvements put upon the reserve for the purpose of taking away its products were not authorized by Congress. The lease and supplemental agreement were fraudulently made to circumvent the law and to defeat public policy. No equity arises in favor of the lessee or the other petitioners to prevent or condition the granting of the relief directed by the Circuit Court of Appeals. Petitioners are bound to restore title and possession of the reserve to the United States, and must abide the judgment of Congress as to the use or removal of the improvements or other relief claimed by them. *Pan American* case, *supra*, p. 510.

*Decree affirmed.*

Mr. Justice Van Devanter and Mr. Justice Stone took no part in the consideration or decision of this case.