## FALL v. UNITED STATES.
### No. 5171.

Court of Appeals of District of Columbia.
Argued Feb. 3, 1931.
Decided April 6, 1931.

Wm. E. Leahy, Wilton J. Lambert and Frank J. Hogan, all of Washington, D. C., for appellant.

Leo A. Rover, U. S. Atty., of Washington, D. C., and Atlee Pomerene, of Cleveland, Ohio (Frank Harrison, of Cleveland, Ohio, of counsel), for the United States.

Before ROBB and VAN ORSDEL, Associate Justices, and COX, Justice, Supreme Court of the District of Columbia.

VAN ORSDEL, Associate Justice.

Appellant Albert B. Fall was convicted in the Supreme Court of the District of Columbia of the crime of bribery in violation of section 117 of the United States Criminal Code (18 USCA § 207); and from a judgment sentencing him to pay a fine of $100,000 with imprisonment for one year this appeal was prosecuted.

The indictment recites that President Taft on December 13, 1912, promulgated the following order: "It is hereby ordered that all lands included in the following list and heretofore forming a part of Petroleum Reserve No. 2, California No. 1, withdrawn on July 2, 1910, from settlement, location, sale or entry, and reserved for classification and in aid of legislation under the authority of the Act of Congress entitled An Act to authorize the President of the United States to make withdrawals of public lands in certain cases (36 Stat. 847 [as amended, 43 USCA §§ 141–143]), shall hereafter, subject to valid and existing rights, constitute Naval Petroleum Reserve No. 2, and shall be held for the exclusive use or benefit of the United States Navy until this order is revoked by the President or by Act of Congress. To this end and for this public purpose, the order of July 2, 1910, is modified and the withdrawal of that date is continued and extended insofar as it affects these lands."

The Act of Congress of June 4, 1920, 41 Stat. 813 (34 USCA § 524), provided as follows: "The Secretary of the Navy is directed to take possession of all properties within the naval petroleum reserves as are or may become subject to the control and use by the United States for naval purposes * * * to conserve, develop, use, and operate the same in his discretion, directly or by contract, lease, or otherwise, and to use, store, exchange, or sell the oil and gas products thereof, and those from all royalty oil from lands in the naval reserves, for the benefit of the United States."

On May 31, 1921, President Harding promulgated an Executive Order as follows: "Under the provisions of the Act of Congress approved February 25, 1920 (41 Stat. 437), authorizing the Secretary of the Interior to lease producing oil wells within any Naval Petroleum Reserve; authorizing the President to permit the drilling of additional wells or to lease the remainder of any part of a claim upon which such wells have been drilled, and under authority of the Act of Congress approved June 4, 1920 (41 Stat. 812, 813 (34 USCA § 524), directing the Secretary of the Navy to conserve, develop, use and operate, directly or by contract, lease, or otherwise, unappropriated lands in the Naval Reserves, the administration, and conservation, of all oil and gas bearing lands in Naval Petroleum Reserves Nos. 1 and 2 in California, and Naval Petroleum Reserve No. 3 in Wyoming, and Naval Shale Reserves in Colorado and Utah, are hereby committed to the Secretary of the Interior subject to the supervision of the President, but no general policy as to drilling or reserving lands located in a Naval Reserve shall be changed or adopted except upon consultation and cooperation with the Secretary or Acting Secretary of the Navy. The Secretary of the Interior is authorized and directed to perform any and all acts necessary for the protection, conservation, and administration of the said Reserves subject to the conditions and limitations contained in this order and of the existing laws or such laws as may hereafter be enacted by Congress pertaining thereto."

It is then charged that immediately following the promulgation of the Executive

508

Order of President Harding, Albert B. Fall, in pursuance thereof, as Secretary of the Interior, assumed and undertook the administration and conservation of the properties mentioned in the Executive Orders; and that at the time of the committing of the offense charged he was an officer of the United States in an official capacity, and while acting in that capacity he assumed and undertook to dispose of the so-called royalty oil which had accrued and which was to accrue to the United States during the period specified under leases and contracts made and to be made of lands in said Naval Reserves, and to make further similar leases and contracts covering lands in the Naval Reserves.

The indictment further charges that defendant, "without advertisement and request for or permission of competitive proposals and bids," made a contract with the Pan American Petroleum & Transport Company for the construction in the territory of Hawaii of storage tanks of the capacity of 1,-500,000 barrels to be filled with fuel oil in consideration of the United States delivering to said corporation at the places of production in the Naval Reserves and in further consideration of giving to said corporation a lease "carrying the privilege of extracting petroleum oil from the entire unleased portion of said Naval Petroleum Reserve."

It is also charged that in pursuance of the authority assumed by defendant and by virtue of the Executive Order, "there then became and was pending before said Albert B. Fall, in his said official capacity, the question and matter of his decision and action upon said negotiations; that Edward L. Doheny, on November 30, 1921, was the president and director of said Pan American Petroleum and Transport Company and was actively engaged in the conduct of its business affairs"; and that Albert B. Fall, as Secretary of the Interior, and in connection with the administration of the Naval Petroleum Reserves located within the state of California, unlawfully and feloniously accepted from Edward L. Doheny, on November 30, 1921, the sum of $100,000, with intent to have his decision influenced in approving and making the contracts and lease in question between the United States and the Pan American Petroleum & Transport Company, in accordance with the agreements and negotiations theretofore conducted between defendant and Doheny.

Prior to the trial on this indictment, a second indictment was returned by the grand jury for the District of Columbia charging defendant and Edward L. Doheny with conspiracy to defraud the United States in violation of section 37 of the Criminal Code (18 USCA § 88). This indictment in substance charged that defendant and Doheny had agreed on and prior to November 30, 1921, that defendant, in consideration of the payment to him on that date by Doheny of the sum of $100,000, would award to the Pan American Company the same contracts and lease set out in the bribery indictment.

The government elected to proceed to arraignment and trial on the conspiracy indictment, the trial resulting in a verdict of not guilty. Defendant then interposed a demurrer to the indictment charging him with bribery on the broad ground that inasmuch as defendant was acting without jursdiction in the making of the contracts and lease, and in a capacity not authorized by law, he could not be guilty of bribery. This demurrer was overruled, whereupon the defendant submitted four special pleas to the indictment, in substance that the judgment and acquittal in the conspiracy case was res adjudicata as to the present case, and that to subject defendant to trial in the bribery case would be to twice put him in jeopardy in violation of the Fifth Amendment of the Constitution of the United States.

We will consider the points relied upon by counsel for defendant in the order in which they are presented. It is contended that there can be no bribery of an official to do a particular act unless the law requires or imposes upon him the duty of acting; and that, inasmuch as the Executive Order of May 31, 1921, has been declared by the courts to be void, no legal authority was imposed upon defendant as Secretary of the Interior to proceed with the administration of the Petroleum Reserves, and there could be no bribery for the inducing of any action on the part of the defendant in respect of the leasing of these Reserves.

Section 117 of the Criminal Code (18 USCA § 207) provides as follows: "Whoever, being an officer of the United States, or a person acting for or on behalf of the United States, in any official capacity, under or by virtue of the authority of any department or office of the Government thereof; * * * shall ask, accept, or receive any money, * * * with intent to have his decision or action on any question, matter, cause, or proceeding which may at any time be pending, or which may by law be brought before him in his official capacity, or in his place of trust or profit, influenced thereby," shall be punished, etc.

It is clear, we think, that defendant in these transactions not only assumed to exercise the authority attempted to be conferred by the Executive Order, but that he acted under color of authority. In the case of Pan American Petroleum & Transport Co., et al. v. United States, 273 U. S. 456, 47 S. Ct. 416, 419, 71 L. Ed. 734, where the contracts in question were set aside on the ground of fraud, the court, considering the authority exercised by defendant in connection with the execution of the contracts and leases in question, said: "E. L. Doheny controlled both companies. Fall was active in procuring the transfer of the administration of naval petroleum reserves from the Navy Department to the Interior. And, after the executive order was made, he dominated the negotiations that eventuated in the contracts and leases. From the inception no matter of policy or action of importance was determined without his consent. Denby [Secretary of the Navy] was passive throughout, and signed the contracts and lease and the letter of April 25, 1922, under misapprehension and without full knowledge of their contents. July 8, 1921, Fall wrote Doheny: 'There will be no possibility of any further conflict with Navy officials and this department, as I have notified Secretary Denby that I should conduct the matter of naval leases under the direction of the President, without calling any of his force in consultation unless I conferred with himself personally upon a matter of policy. He understands the situation and that I shall handle matters exactly as I think best and will not consult with any officials of any bureau in his department, but only with himself, and such consultation will be confined strictly and entirely to matters of general policy.' After that Doheny and his companies acted upon the belief that Fall had authority to make the contracts and leases."

The evidence in the civil case to set aside the contract as fraudulent parallels closely the evidence in this case; indeed, the evidence in the two cases is practically the same as touching the question of authority. On this point the court said at page 498 of 273 U. S., 47 S. Ct. 416, 421: "But the evidence sustains the finding that he [the Secretary of the Navy] took no active part in the negotiations, and that Fall, acting collusively with Doheny, dominated the making of the contracts and leases."

And again on page 500 of 273 U. S., 47 S. Ct. 416, 422: "The facts and circumstances disclosed by the record show clearly that the interest and influence of Fall as well as his official action were corruptly secured by Doheny for the making of the contracts, and leases; that, after the executive order of May 31, 1921, Fall dominated the administration of the naval reserves, and that the consummation of the transaction was brought about by means of collusion and corrupt conspiracy between him and Doheny."

It will be observed that defendant assumed at all times to act in his official capacity as Secretary of the Interior and upon the assumption that the Executive Order was valid. Fall was a de jure officer occupying at the time a lawful office of which he was the lawful head, and even though, as held by the court below, he was here acting in a de facto capacity, he cannot be heard to set up the want of official authority when he is charged with accepting money to influence his assumed official conduct. The gravamen of the offense charged is not the execution of the contracts and lease, but the acceptance of a bribe to influence his official conduct. Sharp v. United States (C. C. A.) 138 F. 878; Rembrandt v. United States (C. C. A.) 281 F. 122; United States v. Rosenthal (C. C.) 126 F. 766.

Defendant was here considering a matter apparently within his jurisdiction, a matter pending before him in his official capacity, and upon which he assumed the official responsibility of rendering a decision. If he accepted money to influence his action, all the elements of the crime of bribery are present. Whether the pending matter is valid or not becomes immaterial, since the acceptance of the bribe is to do an unlawful act. In other words, if, as the Supreme Court held in the civil case, he had authority to make a contract, effective to the extent that it required a decree of the court to set it aside, certainly the making of such a contract corruptly could constitute the basis of the crime of bribery.

It matters not that the Executive Order has since been declared void by the courts. It was an operative order, until declared void. It was sufficient to confer jurisdiction. It at least extended color of authority to the defendant in the pursuance of his official duties. Bribery under these circumstances is well defined in the case of People v. Lafaro, 250 N. Y. 336, 165 N. E. 518, 520, as follows: "The gist of the crime of bribery is the wrong done to the people by corruption in the public service. None can doubt that this defendant sought corruptly to influence a police officer, in the perform-

ance of an act which, it is evident, the defendant, the police officer and the Governor of the state considered a public duty owed by a public servant. We have given to the statutory definition of bribery a construction broad enough to cover cases where a public officer has accepted a bribe to act corruptly in a matter to which he bears some official relation, though the act itself may be technically beyond his official powers or duties."

Counsel for defendant place special reliance upon the decision of this court in the case of Thomson v. United States, 37 App. D. C. 461, where the court in its opinion inserted the following quotation from State v. Butler, 178 Mo. 272, 77 S. W. 560: "There is no rule so uniformly adhered to by the courts, both State and Federal, as the one 'that there can be no bribery of any official to do a particular act, unless the law requires or imposes upon him the duty of acting.'"

In the Thomson Case, however, it was held that the person to whom the bribe had been given had been appointed by the Post Master General, and was exercising an official function at the time the offense was committed. Of course, the rule announced can be sustained where the person is a mere usurper in office, or in the case of a private individual assuming to perform official acts without any color of authority; but that is not this case. Here everything that the defendant did was done as Secretary of the Interior. He was not a usurper of that office. He was a de jure official of a de jure office acting for the government. In the matter of the making of the contracts and lease in question he had had that duty imposed upon him by the President, his superior officer. He believed that it was a legal duty. Doheny and the other lessees believed that defendant had full legal authority to make and execute the contracts and leases. This brings the acts of the defendant within the definition of official function, as given by this court in its opinion in the Thomson Case, where we said: "When, therefore, Congress used the term 'official function,' it had reference to acts official in character, something within the legal duty of the person performing them. It was well known that the word 'officer' has a technical signification, and that many acts or duties of an important nature are legally intrusted to persons not officers at all. It was to cover just such a situation that the term 'official function' was used."

A proper administration of justice imposes upon courts in dealing with existing conditions the duty of giving due regard to the circumstances of the particular case. Defendant was performing grave and important acts in relation to the public lands of the United States, a subject over which he exercised general jurisdiction. This was sufficient to establish a legal presumption of the validity of his acts. The public had the right to assume that he was acting within the limits of his lawful authority. Indeed, the legality of the President's Order of May 31, 1921, seems to have been fully accepted by the Navy Department, since Secretary Denby, in a letter to Fall dated October 22, 1921, among other things, said:

"5. That the Interior Department will exercise its best efforts to obtain for the Navy as large royalties and as favorable returns as practicable by public competition or otherwise.

"6. That the terms for conversion of the crude oil at the well to fuel oil at Tidewater or in tanks to be provided by the lessor, will be submitted to the Navy Department for approval of the qualities, deliveries, engineering, and other features involved.

"7. That all leases and contracts, except as provided in paragraph 6, will be arranged and consummated by the Interior Department, copies of the same being furnished to the Navy Department as a matter of information and record only."

Defendant, in the making and execution of the contracts and leases in question, was acting officially in carrying out the directions of the President, his superior officer—an official function which the record clearly discloses he solicited and which he assumed full authority to perform. He cannot, therefore, be heard to say that he was a mere usurper possessing no lawful authority whatever to perform the acts in question.

It is urged as ground for reversal that the charge made in the present bribery indictment is res adjudicata, and that the United States is estopped by the judgment entered in favor of Doheny and Fall in a former case. On May 27, 1925, Fall and Doheny were indicted for conspiracy to defraud the United States. The facts alleged in the indictment leading up to the charge of conspiracy were substantially the same as those alleged in the present indictment leading up to the charge of bribery. One of the overt acts alleged in the conspiracy indictment was the payment by Doheny of $100,000 to Fall, and this act is charged in the two indictments in substantially the same

language. It necessarily followed that the evidence in support of the charge was substantially the same in both cases, but the offenses charged were not the same. Two or more persons must be involved in a conspiracy. The jury, for aught we know, in the former case may have reached the conclusion that Doheny in paying the $100,000 understood it to be a loan, and the payment was made without intent to influence Fall or without intent to commit any fraud against the government. If the jury believed that, then, however guilty they may have believed Fall to be, it was their duty to return a verdict of not guilty. In other words, in the conspiracy case it was necessary to establish an agreement, understanding, common purpose, or intent, of both the parties charged, while in the present case the intent of Doheny becomes entirely irrelevant. The only mind that the jury was called upon to penetrate was the mind of Fall. What was his intent and motive in accepting the $100,000 at the hands of Doheny? But before a plea of res adjudicata can be successfully interposed in a criminal case, the prosecution must have been for the same offense. As said in the case of Burton v. United States, 202 U. S. 344, 380, 26 S. Ct. 688, 698, 50 L. Ed. 1057, 6 Ann. Cas. 362: "A plea of autrefois acquit must be upon a prosecution for the same identical offense." The crime of conspiracy and the crime of bribery are separate and distinct offenses. There was therefore no error in overruling the plea in abatement on this point.

■ Error is assigned in the action of the trial judge in excusing from the jury one Beatrice P. Duke. After full examination on voir dire, and the jury had been accepted by counsel, the trial judge informed the jurors that they would be locked up during the continuance of the trial, and if any of the ladies on the jury desired to be excused they could then inform the court, whereupon the juror Duke requested to be excused and was excused from further service. Objection and exception was taken by counsel for defendant to the action of the court. Another juror was called, qualified on voir dire, and was accepted by counsel. The jury was then sworn and the trial proceeded with.

The Act of February 26, 1927, section 215a of the D. C. Code (D. C. Code 1929, T. 18, § 358), provides as follows: "No person shall be disqualified for service as a juror or jury commissioner by reason of sex but the provisions of law relating to the qualifications of jurors and exemptions from jury duty shall in all cases apply to women as well as to men: Provided, That such service shall not be compulsory on any woman."

We think there was no error in the ruling of the court. Counsel for defendant at the time the juror Duke was dismissed still had four peremptory challenges. These were not exercised. It was within the discretion of the court at that stage of the proceedings to dismiss from the jury a woman upon her own request. The jury had not been sworn, and defendant had not therefore been placed in jeopardy. The right exercised by this juror to be excused is recognized by the statute, and, inasmuch as defendant still had a number of peremptory challenges which he never exercised, it is difficult to see how he could be prejudiced by the action of the court in this respect. This is not a case of a trial court arbitrarily forcing upon the defendant a juror who on his examination has expressed bias or prejudice, as in Kleindienst v. United States, 48 App. D. C. 190. In Welch v. Tribune Publishing Co., 83 Mich. 661, 47 N. W. 562, 563, 11 L. R. A. 233, 21 Am. St. Rep. 629, it was held that the judge has not the "right to reject a qualified juror with whom the parties are satisfied, unless for sufficient cause; and such cause should appear upon the record." In the present case, the cause was the exercise by the woman juror Duke of her statutory right to be excused from service, and this clearly appears upon the record. This constituted sufficient cause to justify the action taken by the court.

In Horton v. United States, 15 App. D. C. 310, where the question of the power of the court in the impaneling of a jury was involved, Mr. Justice Shepard, speaking for the court, said: "In the process of impaneling the jury, the talesmen are examined by and in the presence of the court touching their qualifications. Qualification is a question of mixed law and fact submitted to the sound discretion of the court, and the exercise of that discretion ought not to be disturbed, unless there be disclosed manifest error to the prejudice of the accused. * * * An accused person brought to trial acquires no vested right to have a particular member of the panel sit upon the trial of his case, until, at least, he shall have been accepted and sworn. What the accused is entitled to is a trial by an impartial jury duly qualified and impaneled to sit thereon. That the appellant had such a jury is not denied. No objectionable person was forced upon him; his peremptory right of challenge was not exhausted."

Counsel for defendant challenge the action of the trial court in admitting evidence of transactions with one Sinclair in making a lease with the Mammoth Oil Company for the development and operation of Naval Reserve lands in Wyoming, known as the Teapot Dome. The Mammoth Oil Company lease was made some time prior to the commission of the offense here charged. The record discloses no connection between Doheny and Sinclair, but it does disclose that Fall was considering the two leases on behalf of the government at the same time, and considering each with relation to the other. In the opinion in the case of Mammoth Oil Co. v. United States, 275 U. S. 13, 40, 48 S. Ct. 1, 6, 72 L. Ed. 137, the court said: "Fall personally conducted the negotiations with Sinclair. And he contemporaneously arranged with Doheny the contract that was set aside for fraud in the Pan American Case, supra." It appears from the record that Sinclair began negotiations for a lease of Naval Petroleum Reserve No. 3, in Wyoming (Teapot Dome), in December, 1921, at the same time that negotiations were opened for the first contract that was given Doheny's company. The date of Sinclair's proposition for lease was February 3, 1922. It also appears that just before defendant went to his home ranch in New Mexico on April 30, 1922, he expressed some disappointment to his assistant Finney that he was not in shape to close with Doheny, stating that he "was anxious to close up all the relating oil matters at the same time." Finney, testifying to this statement, said that he assumed defendant "referred to the Mammoth lease as well as the storage matter when he referred to the relating oil matters."

Indeed, the record clearly shows that while there is no relation between Sinclair and Doheny, defendant was carrying along the respective transactions simultaneously and with a common motive in mind. Transfer to defendant by Sinclair of a large amount of government bonds, and the alleged loan of $100,000 by Doheny to Fall to purchase the Harris ranch, were prompted by initial suggestions from Fall of difficulties that he was having in relation to his ranch holdings in New Mexico. Both sums were advanced in connection with these transactions, and presumably to aid Fall in carrying on his ranch enterprise, and relieving him from financial difficulties in which he had become involved. The two transactions are so closely associated as to bring the admission of the testimony as to the Sinclair matter well within the rule of evidence permitting testimony of other offenses or transactions as bearing upon the motive or intent of the accused. The rule is well stated in Moore v. United States, 150 U. S. 57, 60, 14 S. Ct. 26, 37 L. Ed. 996, and quoted by Chief Justice Martin in Eagles v. United States, 58 App. D. C. 122, 25 F.(2d) 546, 548, as follows: "Where the question relates to the tendency of certain testimony to throw light upon a particular fact, or to explain the conduct of a particular person, there is a certain discretion on the part of the trial judge, which a court of errors will not interfere with, unless it manifestly appear that the testimony has no legitimate bearing upon the question at issue, and is calculated to prejudice the accused in the minds of the jurors." Such evidence may be used not only in arriving at the motive and intent of a defendant, but for establishing the constituent elements of the crime of which the defendant is accused. Price v. United States, 53 App. D. C. 164, 289 F. 562.

As showing the close connection the Sinclair and Doheny transactions had in the mind of defendant, reference may be had to his letter to the Senate committee on public lands on December 26, 1923, where he said: "The fact that Mr. H. F. Sinclair came to Three Rivers with his wife and another lady and gentleman on December 31, 1921, or January 1, 1922, just after I had taken possession of the Harris home ranch property and of the Harris-Brownfield cattle have incited some evil minded persons to the conclusion that I must have obtained money from Mr. Sinclair. It should be needless for me to say that in the purchase of the Harris ranch or in any other purchase or expenditure I have never approached E. L. Doheny or anyone connected with him or any of his corporations or Mr. H. F. Sinclair or anyone connected with him or any of his corporations, nor have I ever received from either of said parties one cent on account of any oil lease or upon any other account whatsoever."

After he had stated that he received the $100,000 to purchase the Harris ranch from Edward B. McLean, which Mr. McLean denied in his testimony given before the Senate committee, he wrote Senator Thomas F. Walsh as follows: "I desire to advise you that I have carefully read the testimony which Mr. McLean gave today, and that I endorse the accuracy of the same. I will also say that before giving his testimony Mr. McLean had a conference with me and I told him that, so far as I was concerned, it

was my wish that he answer freely, and, in this connection, I will say that it is absolutely true that—I did not finally use the money from Mr. McLean, which he expressed himself willing to give me, because I found that I could readily obtain it from other sources. I wish it thoroughly understood that the source from which I obtained the money which I used--was in no way connected with Mr. Sinclair or in any way involved in the concession regarding the Teapot Dome, or any other oil concession."

The admissibility of evidence of transactions of a kindred character to the one charged as showing fraudulent intent, the purpose for which the testimony was introduced in the present case, is sustained in Wood v. United States, 16 Pet. 342, 360, 10 L. Ed. 987, as follows: "The question was one of fraudulent intent or not; and upon questions of that sort, where the intent of the party is matter in issue, it has always been deemed allowable, as well in criminal as in civil cases, to introduce evidence of other acts and doings of the party, of a kindred character, in order to illustrate or establish his intent or motive in the particular act directly in judgment. Indeed, in no other way would it be practicable, in many cases, to establish such intent or motive, for the single act, taken by itself, may not be decisive either way; but when taken in connection with others of the like character and nature, the intent and motive may be demonstrated almost with a conclusive certainty."

The whole record in this case is so replete with Fall's concurrent handling of the California and Wyoming leases, coupled with the fact that the moneys received by him in each case were used for a similar purpose, that all doubt as to the propriety of the court below in admitting this evidence is removed. Indeed, counsel for defendant seem to have conceded the competency of this evidence in requesting the following prayer, which was allowed by the court: "You are instructed that there is no charge in this indictment involving any transaction to which H. F. Sinclair was a party. You are further instructed that the evidence regarding transactions to which he was a party is before you for your consideration only insofar as it throws light, if any, upon the intent of the defendant in connection with the transaction between him and Doheny, and unless the testimony relating to the transaction in which Sinclair participated in your judgment throws light upon the defendant Fall's in-

tention on November 30, 1921, in his transaction with Doheny, you shall disregard entirely the evidence relating to the so-called Sinclair transaction."

It is contended, however, that there were certain transactions connected with the Sinclair evidence that were improperly admitted over the objection and exception of the defendant. It appears that one Everhart, defendant's son-in-law, was the ranch manager for the Tres Ritos Cattle & Land Company, in which Sinclair was alleged to have purchased an interest with the bonds which he transferred to Fall through Everhart. Defendant directed Everhart to give Sinclair a check for $1,100 for certain cattle, as he did not want it to appear that the cattle were a gift from Sinclair. When Everhart gave Sinclair the check, Sinclair returned $1,100 in currency, with a statement that he wished it used to cover certain expenses at the ranch. Everhart later received $10,000 from Sinclair at Three Rivers, N. M., where Fall's home ranch is located; and $25,000 was later received at the Wardman Park Hotel, in Washington, where Fall resided. It does not appear directly from the evidence that Fall was informed of these three transactions. Error is accordingly assigned in the admission of testimony as to these transactions in evidence.

The testimony of Everhart related to actual transactions in connection with the negotiations of Sinclair with Fall, and the alleged interest which he held in the ranch property. Everhart, the general manager, was the agent of both Fall, who owned a half interest in the ranch, and Sinclair. The testimony that Fall had not seen the books of the company and was therefore not apprized of these transactions is not conclusive. They were all evidentiary facts tending to establish the relations between Fall and Sinclair. Considering the close relation of the parties, that, in the handling of the bonds between Sinclair and Fall, Everhart had been the intermediate agent, we think that all these transactions were evidentially relevant to the general issue of conveying to the jury the full Sinclair-Fall transactions as evidence of the motive and intent that Fall had in receiving the money from Doheny in the present case.

We come now to the exceptions to the charge of the court. It is urged that the following statement of the court was erroneous and prejudicial to the defendant: "It also appears that upon three different occasions

subsequent to the receipt of that money the defendant was asked about it. On at least one of those occasions he asserted his right to say nothing about it, and he was right in that. He could have said nothing whatever about it. But there were occasions, in connection with a certain quasi-judicial situation, where, while he was entitled to say nothing, he did say something, and he was required then, as on all occasions, if he spoke, to speak truly. He made certain statements as to where he got that money, and it now appears, from the statements of his own counsel, in arguing his own case, that he did not get that money where he said he got it, and he did get it exactly where he said he did not get it. One of counsel speaks of that transaction as an unfortunate falsehood. Another of his counsel speaks of it as a lie, but a lie that he was entitled to make under the circumstances. In view of those statements of his counsel, I call particularly to your attention that this defendant is not charged in this indictment with lying. He is charged with bribery and with the corrupt intention, at the time this money was received, to favor the source of it; so that it does not necessarily follow that because he lied about it, as his counsel said he did, that he is guilty of this crime. Those are circumstances that have appeared in the evidence that have been emphasized by counsel. The weight and significance of them are wholly for you to decide, and they are to be decided by you in the light of the charges of the indictment, which are bribery, and not lying."

This charge, taken as a whole, would seem favorable to the defendant, inasmuch as had the court failed to have called attention to it in the way he did the admitted falsehoods of the defendant might have created a very prejudicial impression on the minds of the jury. The charge as a whole amounted merely to a caution to the jury only to consider this testimony in connection with all other testimony in the case in arriving at the conclusion as to whether or not the defendant was guilty of the crime of bribery as charged, and not of the offense of lying. This was merely an outstanding piece of evidence which the trial judge in his discretion felt should be called to the attention of the jury, and, when taken in connection with other parts of the charge, wherein the court cautions the jury that they are to disregard the statements the court may make in regard to the evidence in the case and reach their conclusions independent of these statements, we cannot possibly find any error in this portion of the court's charge.

Exception was taken to portions of the following part of the charge: "Counsel have urged you to send this man back to the sunshine of New Mexico. You have nothing whatever to do with the sunshine of New Mexico. I realize that a man or a woman in a jury box has exactly the same feelings of sympathy and sorrow that a man or a woman sitting elsewhere has; and the judge upon a judicial bench, wearing a shroud, has exactly the same feelings that a man sitting anywhere else has. But neither you nor I have anything to do with the sunshine of New Mexico. You are here to decide this case upon the evidence, and nothing else. Counsel has also said to you that no matter what your verdict is, you cannot be called to account for it by anybody anywhere; and that is true. You have the physical power to decide this case entirely upon your feelings, whether they are merciful toward the defendant or whether they are hostile toward the defendant; and to turn your back upon the evidence. But you cannot lawfully do that. You have a physical power to do it. Now, the most that any jury may lawfully do in the direction of clemency is what any jury may do in a proper case if, in their good judgment, the case requires it. It may couple its verdict with a recommendation for the mercy of the law. If that is done, such a recommendation is no part of the verdict. It has no binding effect upon the court or upon anybody else. It is the expression of the judgment and opinion of the jury upon the consideration and examination of the case, voluntarily made upon the motion of the jury itself. That much may be done lawfully by a jury, and no more, in that direction. That, once done, takes its place in the record of the case, and it goes wherever the record of the case goes, for whatever weight, if any, it may have."

Of course, it is error for the court to suggest to the jury the probability of clemency by the court in rendering judgment upon their verdict without further qualification. Miller v. United States, 37 App. D. C. 138. The danger of a charge of this sort is the inducement it may have in the mind of some juryman to render a verdict of guilty on the theory that the penalty imposed by the court would be lighter with the recommendation of clemency incorporated into the verdict. We think, however, the charge of the court in this case was not prejudicial to the defendant, but merely by way of caution to the jury. The atmosphere existing in the courtroom throughout this trial, as disclosed by the record, was most remarkable. The defendant, over seventy years of age, an invalid, was

brought into the courtroom in a wheel chair, wrapped in blankets, to stand trial on the indictment for bribery. He had had an illustrious official career. This situation was brought to the attention of the jury in the most forceful and dramatic manner by counsel for the defendant, clearly for the purpose of creating a feeling of sympathy in the minds of the jury favorable to the defendant. In one appeal to the jury the following language was used: "It is like asking you to wreck and ruin men who stand upon the threshold of the hereafter. It is like asking you to go out and steel your hearts and minds against what you know to be the fact; instead of sending him back to his family, instead of sending the slumped form in yonder chair back to his home and his family, sending him to the penitentiary." In another portion of the argument counsel, impressing upon the jury the fact that they are the sole judges of the evidence, and that upon them rests the duty of determining whether the defendant is guilty or not guilty, said: "With the power comes a great responsibility. And now I shift from my shoulders the responsibility which has been mine and place it well upon yours. And I plead with you, and plead with you with all the earnestness at my command, that before darkness closes in on this good day you will send Albert B. Fall back to the sunshine and the lung-healing climate of his beloved New Mexico with your verdict of not guilty—not guilty."

At another part in the argument counsel, referring to defendant's letter of December, 1923, in which he denied having received any money from Doheny and later explained that it was written to avoid giving information to political opponents, said: "And in that hour was born the determination of Albert B. Fall to risk the most precious things that he had, his reputation and honesty, and truthfulness, in order to save his friend, his family, from that terrific onslaught and avalanche of political persecution that has ever since thrown itself about him. * * * He deliberately lied to the Senate of the United States, as he had a right to do and as he should have done under those circumstances. He attempted to deceive them with every power in his command. It was a futile gesture, gentlemen. * * * It was that, gentlemen of the jury, that has brought these two old men to the end of the trail, bowed with worry, broken in spirit—it is that that has brought them thousands of miles away, from the day they first spent fighting the avalanche that has impended over their heads. Sitting today as you see them trying to protect each other as they did in the old days. * * * It is in your hands to determine whether or not he shall go back and spend the last few remaining days in happiness and peace; whether a month from tomorrow his shall be a day of Thanksgiving or a day of death."

These are only examples of the touching appeal that was made to the sympathies of the jury. "The trial judge does not sit as a mere moderator of a town meeting." It is his duty to see that the jury are not misled by such appeals to sympathy. It is his duty to caution the jury as to the responsibility which rests upon them of deciding the case upon the evidence and not upon any sympathetic feeling that they may have arising either from the phyiscal or mental condition of the defendant.

The court, at the conclusion of the charge, carefully cautioned the jury as to the limits placed upon the trial judge in commenting upon questions of fact as follows: "The facts are for you, and any comment I may have made is in no way binding upon you. My function in this case is to decide the questions of law as they arise, and to do what little is humanely possible to keep the talk of the lawyers within reasonable bounds. All the questions of fact are wholly for you to decide, upon the evidence and upon your oaths and upon your consciences, and upon nothing else."

The charge of the court on the whole was comprehensive, fair, and impartial. As said by Chief Justice Waite in Reynolds v. United States, 98 U. S. 145, 168, 25 L. Ed. 244: "The effort of the court seems to have been not to withdraw the minds of the jury from the issue to be tried, but to bring them to it; not to make them partial, but to keep them impartial."

The judgment is affirmed.