## In re GLASSBERG.

District Court, S. D. New York.
May 16, 1932.

Charles Seligson, of New York City, for trustee.

Lefkowitz & Chapman, of New York City, for bankrupt.

CAFFEY, District Judge.

The petition relates to numerous items. I shall consider only two, linings and pay rolls. As to these the trustee seeks a reversal of the referee's order denying relief.

Upon many facts the parties are in accord. In the statements below as to linings, the figures employed will be those which, so far as I can discover, are the most favorable to the bankrupt which are to be found in the evidence.

It is undisputed that in 1930, between July 14 and the date (September 29) the bankruptcy proceeding was instituted, the bankrupt purchased 11,409⅜ yards of lining; also that the receiver found on hand 1,536 yards. The difference of 9,878⅜ is, therefore, what is involved.

It is undisputed also that in the period mentioned the bankrupt produced (either in his own factory or through contractors, to whom he supplied material) 2,122 coats from woolen goods; also that during the period he purchased 7,951 yards of woolens. Deducting from the latter figure 55 yards which came to the receiver and 288 yards, the maximum allowable under the proof, for shrinkage through sponging in the course of manufacture, or a total of 343 yards, it results that 7,608 yards of woolens were available for use in making up the 2,122 coats. So far as I have been able to glean from the evidence, or so far as has been claimed in argument, the quantity stated is the maximum of the woolens that were available. Assuming, as we must assume in order to lean toward the interpretation of the testimony which helps the bankrupt in this controversy, that the entire 7,608 yards of woolens were consumed in the production of the 2,122 coats, then, in order to ascertain the number of yards of linings used in such production, we must resort to a comparison of the yardage of woolens and of linings, respectively, necessary for manufacturing the coats. The most favorable view toward the bankrupt to be gotten from the testimony is that it required on the average, as is agreed

by the bankrupt's counsel, one-fourth of a yard less of linings than of woolens to go into a coat when complete; hence that the yardage of linings would be 530½ less than of woolens. If 530½ be deducted from 7,608, the balance would be 7,077½; and this may properly be taken as the credit to which the bankrupt is entitled in determining how much of the 9,873⅜ yards of linings has been accounted for through examination of the process of the manufacture of woolen coats. The difference between 9,873⅜ and 7,077½ is 2,795⅞ yards. That is the net which must be accounted for by means other than by consumption in the manufacture of woolen coats.

To this method it might be objected that we cannot be sure that 7,608 yards of woolens (the total purchased between the dates under inquiry) were all that were actually used in manufacturing the coats. If so, it would be a sufficient answer to point out that it was open to the bankrupt to show, if it were true, that he had at his plant other woolens on July 14, and that he has not done so [In re H. Magen·Co. (C. C. A.) 10 F.(2d) 91]; further, that, so far as can be gathered from the record, there were no additional woolens used in producing the 2,122 coats, and it would be mere speculation to surmise that there were. There seems to me, however, to be an even more persuasive reason for saying that the scheme by which the demonstration was undertaken by the trustee is fair to the bankrupt. The counsel for the bankrupt submitted a very full brief to the referee. This has been furnished to me. It concedes that the purchases of woolens during the time in question aggregated only 7,951 yards. Throughout the lengthy recitals there is not even a suggestion that after July 14 the bankrupt ever had in possession or used in manufacture, either in his own plant or through his contractors, a greater quantity of woolens. Moreover, if there had been an accumulated stock on hand July 14, accuracy would have required also that it be shown what remained on hand September 29, when the bankruptcy petition was filed. Furthermore, the testimony is that the first purchases of either cloth or linings for the autumn of 1930 by the bankrupt were made on July 14, and that for a substantial time prior thereto he made no purchases. The trustee, as I see it, has given the bankrupt the benefit of every doubt. The argument of the trustee takes as its basis the assumption that every yard of woolens in the hands of the bankrupt was used in manufacture and the highest figure (which is apparently undisputed) warranted by the proof of the yardage of such woolens.

The criticism of the trustee's method most insisted on by the bankrupt is that the reasoning is based on inferences merely. To this objection it is enough to reply that the figures are taken from the books of the bankrupt. They are therefore based on admissions. These are competent evidence against him, in the absence of it appearing that he himself omitted to enter the whole truth in the books. Moreover, admissions are among the best types of evidence now to be found; there is no reason why the trust estate should be compelled to rely on or even to call the bankrupt as its witness; and the trustee is entitled to proceed by analysis of documents created by the bankrupt or by any other rational scheme he can devise in order to uncover the truth. Cf. In re Ginsburg (D. C.) 50 F.(2d) 240; In re Cohan (C. C. A.) 41 F.(2d) 632.

Counsel for the bankrupt also suggests that there was variance in the testimony as to the number of yards of woolens used in making a coat. That is true. Nevertheless, the fact is of no significance in the present connection. In the figures employed, no argument is predicated on such number. As previously indicated, the trustee assumes that in the production of coats the bankrupt used every yard of woolens which he purchased during the period from July 14 to September 29, 1930, and, as also previously indicated, there is no evidence from which it can be inferred that any other woolens were used. The counsel for the trustee says, and the counsel for the bankrupt in his brief·before the referee agreed, that in each coat, on the average one-fourth of a yard less of linings than of woolens was employed. Taking, therefore, the maximum of woolens available, the bankrupt is given credit for the total yardage thereof less one-fourth of a yard for each of the 2,122 coats produced. In this way the number of yards of linings consumed is stated to be 530½ less than the number of yards of woolens. The credit thus given the bankrupt seems to me to be an unassailable maximum of what he is entitled to.

Accordingly, unless (as later discussed) the bankrupt can by evidence reduce through legitimate credits the 2,795⅞ yards of linings, the trustee is entitled to a turnover order for them.

It is true that the order should not be made, unless the evidence sustaining it be "clear and convincing" (Oriel v. Russell, 278

U. S. 358, 362, 364, 49 S. Ct. 173, 73 L. Ed. 419); but, let it be observed, it has been conclusively established that the 2,795⅞ yards were held by the bankrupt shortly preceding the bankruptcy, and no part of it was scheduled or on hand at the time of the bankruptcy, nor was it then or has it since been turned over to the receiver or the trustee. Cf. Toplitz v. Walser (C. C. A.) 27 F.(2d) 196. This makes a complete case for the order, save only to the extent (if any) that there be credible explanation given by the bankrupt. In re H. Magen Co. (C. C. A.) 10 F.(2d) 91. The conclusion stated is not at all in conflict with In re Redbord (C. C. A.) 3 F.(2d) 793, or In re Panamer Realty Corporation (D. C.) 54 F.(2d) 656.

■ The testimony was voluminous. The transcript of the oral testimony, without the exhibits, but including the section 21a examination, consists of 460 pages. Much of it concerns matters not now before me. I have not had opportunity to read it all. I have, however, gone over everything mentioned by industrious and careful counsel on both sides and considerably more. So far as has been called to my attention or I have myself discovered, while the bankrupt was examined under section 21a of the Bankruptcy Act (11 USCA § 44(a), subsequent to the bringing out of the evidence on which the trustee relies with regard to the linings, as hereinbefore recited the bankrupt did not take the stand, save that he entered sweeping denials, saying twice with respect to linings, in general terms only, that at the time of the bankruptcy he retained none of them in his possession or under his control. The facts were peculiarly within his knowledge. If anything relevant was overlooked or omitted, he was able to supply it. Nevertheless, he said nothing as to details or by way of substantiation of his denials. Such silence is itself "evidence of the most persuasive character," and is to be taken strongly against him. Bilokumsky v. Tod, 263 U. S. 149, 153, 154, 44 S. Ct. 54, 68 L. Ed. 221; Mammoth Oil Co. v. United States, 275 U. S. 13, 51–53, 48 S. Ct. 1, 72 L. Ed. 137. Upon the most exacting application, therefore, of the rule prescribed in Oriel v. Russell, supra, as to the measure of proof in a turnover proceeding, the evidence here is sufficient to demand that a turnover order be made, unless by testimony from persons other than the bankrupt he is extracted from the position in which he chose to leave himself by keeping his lips sealed.

I now turn to the contentions of the bankrupt that a credible explanation exempting him from liability, under the rule laid down in the Magen Case, has been presented.

In argument the bankrupt uses 2,119 as the number of woolen coats produced by him between July 14 and September 29, 1930, whereas the trustee uses 2,122. Hence in that respect no error has been made against the bankrupt.

For the woolen coats the bankrupt uses 6,092⅛ as the yardage of linings, whereas the trustee uses 7,077½. In that regard also there has been no error by the trustee, adverse to the bankrupt.

Both parties accept 11,409⅜ as the yardage of linings purchased by the bankrupt subsequent to July 14 and 1,536 as the number which came into the possession of the receiver. In these two matters, therefore, they are in accord. The differences, as stated by the bankrupt, consist of five items. These do not make up fully what the trustee argues should be accounted for; but for the present purposes they will be treated as if they totalled the 2,795⅞ yards of linings which the trustee charges that the proof demonstrates that the bankrupt retained for himself.

Employing short terms, by way of identification only, the five items urged by the bankrupt, as having been ignored by the trustee, are as follows:

| | | |
|---|---|---|
| Used in capes.............. | 617⅞ | yards |
| Miller spoiled silk..........1,100 | | " |
| Benowitz returns .......... | 420 | " |
| Spiegelman returns ........ | 900 | " |
| Stolen (the balance; say)... | 743 | " |

Each item will be considered.

In the first place, no additional credit should be given for capes. The capes were of woolen and were parts of the coats. The whole of the woolens shown to have been in the possession of the bankrupt on or after July 14, 1930, have been used as the basis for estimating the 7,077½ yards of linings that could have been availed of by the bankrupt in making up the 2,122 coats. In consequence, the yardage of linings for capes, by which the bankrupt seeks to supplement the 7,077½ yards (or, as stated by him, the 6,092⅛ yards), has already been credited to him in the figures relied on by the trustee. As I see it, the bankrupt seeks a double benefit for the yardage of the capes.

■ The statement of Miller, salesman for an outside silk house, as to having overheard the bankrupt complain to one of his cutters of the spoiling of silk (stated by the trustee's counsel as 1,080 yards and by the bankrupt's

counsel as 1,100 yards) at best affords no basis for an inference that an equal amount, or any, linings were destroyed or rendered unusable at the same time. Even if, however, what was said be taken to mean that the talk implied that the silk was lined, the evidence is rank hearsay, is incompetent, and is no proof whatever either that silk was spoiled or that linings were used in connection with it. Neither the bankrupt nor the cutter whom he is said to have criticized, both of whom must be presumed to have precise knowledge on the point, was called. So far from the explanation tendered being credible or satisfactory, it was no explanation at all.

The testimony of the contractors Benowitz and Spiegelman, that they returned linings to the bankrupt, is quite vague; but, even if accepted in its entirety, it affords no ground for the figures asserted by the bankrupt for claimed credits on that account. It contains no warrant for concluding that there is any deficiency in the credit of 7,077½ yards given the bankrupt, in the figures of the trustee, to correspond fully with the total to which the bankrupt is entitled for the production of coats both in his own plant and in the manufacture for him by outside contractors. What Benowitz said is wholly worthless. What Spiegelman says is that he returned a large quantity of linings to the bankrupt; that they were short; and that the bankrupt gave him different linings. There is nothing in this which establishes that any linings were destroyed or consumed or that for this reason the bankrupt should have a credit; nor is there even an attempt to show the quantity of linings that were returned.

Lastly, the robbery occurred after the receiver went into possession and had made the inventory showing 1,536 yards of linings then at the bankrupt's place of business. Confessedly, the bankrupt had the benefit of all on hand at the moment of bankruptcy. It follows that the undisputed figure of 1,536 yards of linings taken over by the receiver included whatever loss may have been suffered by theft, and hence that testimony as to the robbery was wholly irrelevant to what is now in issue. Moreover, the testimony about a robbery is vague and fails to identify what was stolen; much less does it afford basis for saying that any linings disappeared

In so far as concerns the item of linings, the bankrupt should be directed to turn over 2,795⅞ yards; or, in the event of failure to do so, the alternative value of $2,572.21, which is at the rate, shown by the proof, of 92 cents on the average as the actual purchase price or cost per yard.

The trustee charges that the pay rolls for five weeks between August 16 and September 20, 1930, were padded. It is undisputed that, according to the books, the total claimed by the bankrupt to have been expended on his pay rolls was $12,495; an average of a little less than $2,500 a week. The trustee estimates the actual excess which the bankrupt covered by fictitious entries and put into his own pocket at $6,007.25. For this a turnover order is sought.

It must be conceded that the argument of counsel for the trustee is very persuasive. It perhaps would not be too strong to say that it appears to be unlikely that in a factory of the type and size of that maintained by the bankrupt so much as $2,500 a week could reasonably have been expended on the payrolls. Nevertheless, from an examination of all the evidence on the point, I am unable to say that it has been shown by "clear and convincing evidence" that the pay rolls were padded.

With respect to the pay rolls, the condition of the record is quite different from that in regard to the linings. As to the pay rolls, there is positive evidence, including the testimony of the bankrupt himself, that the numbers of employees and their rates of compensation, during the five-week period under consideration, were quite sufficient to build up a pay roll expense as high on the average as $2,500 a week. To a considerable extent the credibility of witnesses is a factor in reaching a conclusion. The referee saw and heard them. I therefore do not feel warranted by the proof—particularly when account is taken of the measure of proof required—in reversing the conclusion arrived at by the referee.

Except as to the linings, the report will be confirmed.

Settle order, in accordance with the foregoing, upon two days' notice.