## In re MARGOLIS.

District Court, S. D. New York.
Nov. 16, 1937.

Percival E. Jackson, of New York City, for bankrupt.

Hahn, Abeson & Golin, of New York City (Julius J. Abeson, of New York City, of counsel), for trustee.

CAFFEY, District Judge.

In my memorandum of January 30, 1936,[1] the first specification was disposed of. The sole remaining question is whether the second specification has been proved. I shall deal only with that matter in the present memorandum.

As a preliminary we should get in mind certain facts, which are undisputed or incontrovertibly established; also certain applicable propositions of law which are indisputable. These will be set out briefly.

All the events involved transpired in 1930. The period with which we are concerned is January 1 to September 22. That will be called the accounting period.

The bankrupt was examined on October 21 and 27, 1930, under Section 21a of the Bankruptcy Act, 11 U.S.C.A. § 44(a). The

---

[1] Not for publication.

minutes of the examination were put in evidence at the hearings on the specifica tions (pp. 158, 159). For convenience the testimony on the examination will be referred to as 21a and the pages given. When reference is made to the minutes of the hearings on the specifications, the pages only will be given.

The second specification alleges that the bankrupt has failed satisfactorily to explain a loss of assets or a deficiency of assets to meet his liabilities. The charge is laid under subdivision (b) (7) of Section 14 of the Bankruptcy Act, 11 U.S.C.A. sec. 32(b) (7).

■■ All agree, as is clear, that the initial burden of going forward with evidence in support of the specification rests on the objector,—in this case the trustee. The duty of the objector in this respect, as sometimes referred to in the decisions, is to make out a prima facie case. In re Strauss, D.C., 4 F.Supp. 810, 812. It is settled, however, that, by force of the provision in the section of the statute mentioned, when an objector shows that there is reasonable cause to believe that the charge is true, the burden then passes to the shoulders of the bankrupt to disprove it. In re Melniker Hammock Mfg. Co., 2 Cir., 45 F.2d 703, 704, 705; Karger v. Sandler, 2 Cir., 62 F.2d 80, 81; In re Lessler, 2 Cir., 74 F.2d 249, 250. See also, Shanberg v. Saltzman, 1 Cir., 69 F.2d 262; In re Sugarman, D.C., 3 F.Supp. 502, 505; In re Tobias, D.C., 49 F.2d 651; In re Monsch, D.C., 18 F.Supp. 913. Indeed, the statute expressly so provides. As relates to the second specification here involved, it says that if "the objector shall show to the satisfaction of the court that there are reasonable grounds for believing" the allegation of the specification, "then the burden of proving" that he has not "failed to explain satisfactorily any losses of assets or deficiency of assets to meet his liabilities" "shall be upon the bankrupt."

■ If a prima facie case be made and the bankrupt fail to furnish a satisfactory explanation, the court has no discretion. Its duty is mandatory. It must deny a discharge. In re United States Restaurant & Realty Co., 2 Cir., 187 F. 118, 120; In re Northridge, D.C., 53 F.2d 858.

Within the rules of law mentioned, there are, therefore, but two inquiries: (1) Did the trustee make out a prima facie case? (2) If so, has the bankrupt exculpated himself from it? Both raise issues of fact.

The answers to them depend exclusively on the evidence.

■ Moreover, it is immaterial whether the objector makes the prima facie showing preceding or at the hearing on the specification. In either event, the burden passes to the bankrupt. Matter of Libbie Siff, doing business under the trade name and style of New York Mill End Pants Co., No. 59,306, February 6, 1936, per Coxe, J. (unreported); In re Kaplan, D.C., 17 F. Supp. 956. Nevertheless, in what follows both aspects will be covered. There will be discussion, first, of whether a prima facie case was made in the 21a examination and, secondly, whether one was made at the specifications hearings. If so, then consideration will be given to whether the bankrupt, by proof, has made a satisfactory rebuttal.

That there has been a loss and is a deficiency, as the objector asserts, is shown without dispute.

■ The schedules were signed by the bankrupt and are admissible against him. Schedule A states his liabilities to be $31,966.04 and his assets to be only $11,481.66. Accepting these figures as correct, then manifestly, when the bankruptcy petition was filed on October 9, 1930, there was a deficiency of $20,484.18 (hereinafter sometimes referred to as a deficiency of $20,000).

The net worth of the debtor on January 1, 1930, was $18,095.62 (pp. 122, 128). When the bankruptcy petition was filed about ten months later, this surplus had disappeared. In its place there was a deficiency. In consequence, according to the testimony by or in behalf of the bankrupt himself, he had suffered a loss measured by the total of those two sums. The addition of a net worth of $18,095.62 and a deficiency of $20,484.18 brings the loss up to $38,579.80 (hereinafter, for convenience, sometimes called the $38,000 loss).

The controversy relates to furs, sometimes called skins by the witnesses. The schedules show that eight creditors suffered a loss of $25,884.25 on furs they sold to the bankrupt. Save as to $2,298 of this amount, the schedules further show that all the purchases for which this indebtedness was incurred were made within four months prior to the end of the accounting period; that the sales were on credits which carried the due dates of the bills beyond the end of the accounting period; and that no part of the sum has been paid.

The $2,298 (first item on Schedule A-3), not shown on the face of the schedules to be covered by a note or when payable, is owing to H. Bodek. A witness from that concern produced its books and testified (pp. 132-135). This evidence was that the unpaid open account which was incurred within the four months' period (namely, on June 16, September 4 and September 11, 1930) and is still unpaid, totals $2,560 (pp. 132, 133). This is more than the open account ($2,298) set out in the schedule. To the extent of the $2,298, however, as already stated, it appears without dispute that the open account was incurred within the four months' period. For the present purpose, therefore, we may treat that amount as being in the same class with the items covered by notes, which aggregate $23,586.-25. Hence, the total loss suffered by the eight creditors on sales within the four months is brought up to $25,884.25.

The matter may be clarified somewhat by adding a summary of the $25,884.25 indebtedness, shown by the schedules still to be owing to the eight creditors from whom the bankrupt purchased furs in 1930 shortly before the bankruptcy. This is as follows:

| Purchase dates | Creditors | Amount owing |
|---|---|---|
| May 27 | M. Breitman & Sons | $ 6,518.25 |
| June 13 | Rosenthal & Brickman | 1,600.00 |
| July 22 | J. Schierer, Inc. | 1,120.00 |
| July 31 | H. Bodek | 3,432.00 |
| August 15 | M. Breitman & Sons | 2,070.00 |
| August 15 | Deifik & Prufer | 1,415.00 |
| August 19 | M. Wallach | 932.85 |
| August 19 | Lichtman & Shapiro | 650.00 |
| August 21 | Lichtman & Shapiro | 839.40 |
| August 22 | Samuel Londner | 810.00 |
| August 25 | Lichtman & Shapiro | 1,452.00 |
| September 3 | Lichtman & Shapiro | 540.00 |
| September 8 | H. Bodek | 2,206.75 |
| | Total evidenced by notes | $23,586.25 |
| H. Bodek (open account) | | 2,298.00 |
| | Total | $25,884.25 |

As previously pointed out, the bankrupt made the purchases for which the $2,298 is owing on June 16, September 4 and September 11.

The amounts shown by the above table were to Breitman & Sons, $8,588.25; Rosenthal & Brickman, $1,600; Schierer, $1,120; H. Bodek, $7,936.75; Deifik & Prufer, $1,-415; Wallach, $932.85; Londner, $810; and Lichtman & Shapiro, $3,481.40,—total, $25,-884.25.

Restated by months, the purchases of furs within four months preceding the end of the accounting period, for which no payments have been made, were as follows: May, $6,518.25; June, $3,700 (composed of $1,600 from Rosenthal & Brickman and $2,-100 from Bodek); July, $4,552; August, $8,169.25; September $2,746.75 (including 198 from Bodek),—total, $25,884.25.

Of the $31,966.04 total debts owing at the time of the bankruptcy, for the purpose of considering the significance of the amounts owing for furs, we should deduct items aggregating $3,675. These consist of $2,000, incurred in 1929, owing to a man of the same surname as the bankrupt,—presumably a relative,—residing in Germany, and items aggregating $1,675 scheduled as owing to Louis Vogel, which represent merely an exchange transaction (Schedules A(3) and (5); Schedules B(2); 21a, pp. 42, 43, 44-48).

If the $3,675 be deducted from the total of debts stated in the schedules, the balance owing by the bankrupt on all accounts, which constitute the real basis for comparison here, is only $28,291.04. Of this sum the total of $25,884.25 owing to the eight merchandise creditors mentioned above on fur purchases alone is upwards of 90%.

It may be noted also that, apart from those eight creditors, the bankrupt scheduled only ten small merchandise creditors and to them the total owing is $955.04.

When the bankrupt was testifying at the 21a examination, the sole explanation he undertook to make of the loss of or deficiency in his assets was that he was robbed at his place of business, 245 West 29th Street, on Sunday, September 21 (21a, pp. 4-24, 27-44, 48-54). There was no attempt to explain the loss or deficiency in any other way or to base an explanation on any other ground.

On the evidence in the record I am not wholly convinced of the occurrence of a robbery in the way claimed by the bankrupt. I am not entirely free from suspicion that what he says of the happening, even when accompanied by what others say they saw of him after the so-called robbery, was a performance staged by himself and was a sham. However, for present purposes I shall assume that the robbery did occur, and shall refer to it as if it did occur, as claimed by the bankrupt.

Accepting the robbery assumption, how does the case stand? Up to the time of or during the specifications hearings, did the trustee make a prima facie showing that there was reasonable cause to believe that

the bankrupt had not satisfactorily explained loss of or deficiency in his assets?

Let us first consider the 21a examination evidence.

It is to be remembered that the loss of assets during the accounting period ran to $38,000 and that the deficiency in assets to $20,000. We are asked to attribute to a theft the loss of merchandise worth $38,000 and to the same theft the deficiency of merchandise worth $20,000. There was no effort by the bankrupt to establish the quantity or the value of furs or of any other property abstracted and carried away by robbers on September 21. Standing alone, is not the recited feature of the proof enough to compel the court to say that there is reasonable cause to believe that the bankrupt did not make a satisfactory explanation in his 21a examination? I think it is.

But this is not all. About a year after the robbery the bankrupt filed schedules. This was approximately a year preceding the first hearing on the specifications of objection to his discharge. When they were prepared, it is fair to infer from the 21a examination that he knew that his creditors did not accept his explanation. Yet what did he tell them in the schedules?

The schedules affirmatively disclosed that, within a short time preceding the robbery, he had bought furs from eight creditors of the price of about $26,000; that the entire amount was unpaid; that the amount was over 90% of all he owed; that the bills for none or practically none of this merchandise would fall due until subsequent to the robbery; that the bills were to run from two to seven months from dates of purchase; that some were not to become due until January, 1931; and that what was owing to the eight creditors was everything except less than $1,000 owing to all merchandise creditors.

When these additional facts are coupled with the great disparity between assets and liabilities at the beginning and at the end of the accounting period, the inference seems to me inescapable that the bare fact of robbery is not a satisfactory explanation. It is enough to establish that there is reasonable cause for believing that the bankrupt's explanation is not satisfactory.

I go further and say explicitly that the mere fact that there was a robbery does not satisfactorily show that there are not "reasonable grounds for believing" that the robbery does not satisfactorily account for the deficiency of $20,000 and the loss of $38,000 (heretofore described) during the accounting period. Cf. Brenner v. Gaunce, 9 Cir., 28 F.2d 606.

As heretofore remarked, the procedural requirement of a prima facie showing by the trustee, in order to shift the burden of proof to the bankrupt, however, does not impose on the trustee the duty of making it in advance of the hearing on the specifications. The contrary is expressly provided by statute. It is expressly said in Section 14(b) (7), 11 U.S.C.A. § 32(b) (7), that the prima facie showing by the objector may be made "upon the hearing of an objection to a discharge." Moreover, as already pointed out, Judge Knox and Judge Coxe have expressly so ruled. Kaplan Case and Siff Case, supra.

We may now inquire, therefore, whether at the hearings before the referee the trustee made a prima facie showing, additional to that made in the 21a examination, that the bankrupt had not satisfactorily explained the loss or the deficiency of his assets to meet his liabilities.

Included in the supplementary evidence at the specifications hearings was much relating to the number of skins which came into the hands of the bankrupt during the accounting period, the number he sold preceding the robbery, the number he should have had on hand at the time of the robbery and the number he actually had on hand at the end of the accounting period (immediately after the robbery). The evidence as to these matters is documentary. Inasmuch, however, as counsel do not agree as to the admissibility of some of the documents, as a preliminary I shall discuss the rules of evidence applicable.

It is plain, and I understand is undisputed, that whether there was a shortage in the furs, and if so its extent, is determinable from a physical inventory of the skins on hand January 1, the books of the bankrupt (supplemented by invoices) and a closing physical inventory of the skins on hand September 22, if these be available.

An opening inventory (Exhibit 1 of October 27, 1930) was made up by the bankrupt in his own handwriting (pp. 14-17, 26, 34, 35, 113; 21a, p. 45). Such an inventory was in the hands of the trustee's accountant. It was lost, but he retained a copy (pp. 12-15, 19, 25, 34). In these circumstances, he was entitled to use the copy in place of the original. Sicard v. Davis, 6 Pet. 124, 139, 8 L.Ed. 342; Winn v. Patterson, 9 Pet. 663, 676, 9 L.Ed. 266; Nash v. Williams, 20

Wall. 226, 246, 22 L.Ed. 254. In the language of Chief Justice Marshall more than a hundred years ago in Sicard v. Davis,—where (as here) the authenticity of an original writing, its loss and the correctness of copies were proved,—"it cannot be doubted, that the copies were admissible."

■ The books of the bankrupt are admissible against him. In re Glassberg, D. C., 59 F.2d 209, 210. · These, with all except a few of the invoices, and where invoices were missing the books or invoices of the sellers of the furs, were produced and were examined (pp. 4-11, 19, 29, 31-35, 42, 92-96, 126, 127, 132, 137, 138). These, of course, were admissible.

A closing inventory was taken by the chairman of the creditors' committee on or about September 22, 1930 (Exhibit 1 of May 23, 1933). A duplicate of this went into evidence without objection (pp. 29, 40-42, 44, 45).

Obviously, therefore, the material for making a computation with respect to the number of skins handled by the bankrupt during the accounting period is available.

The bankrupt dealt chiefly in seven kinds of furs. These were Ermine, Fitch, Mink, Hudson Seal, Baum Marten, Persian Lamb and Fox. Based on the opening inventory, the showing made by the evidence as to the bankrupt's handling of them during the accounting period (pp. 4, 8-10, 18-25, 33-35, 43-45, 49-50, 102-106, 132-138) is as follows:

order to bring the result within the limits of certain accuracy, a deduction of 10% will be made. With that deduction, the result can be relied on (pp. 45, 46, 55, 56, 130, 131). Making the deduction, in the way most favorable to the bankrupt, the total purchases would be 3,099 skins and the total shortages 2,966 skins.

That the 10% deduction is conservative is, as I feel, demonstrated by the fact that the undisputed evidence, which will next be referred to, is that the purchases, during the four months' period, of the seven kinds of skins we have discussed actually aggregated 2,988, instead of the 3,099 arrived at by making a 10% deduction.

Disregarding the books of the bankrupt, the opening inventory and the closing inventory, with respect to purchases of the seven kinds of skins from the eight principal merchandise creditors during the four months just before the bankruptcy, the showing goes further than what was disclosed exclusively by the books or the schedules. From irrefragable and uncontroverted independent evidence,—much of it from the bankrupt's own mouth and all of it fully supported by documents (pp. 92-6, 132, 133, 137),—the following appears:

First: Purchases of skins,—Ermine, 435; Fitch, 181; Mink, 367; Hudson Seal, 1,112; Baum Marten, 48; Persian Lamb, 608; Fox, 225. Total, 2,976.

Second: For these purchases the prices, all unpaid, were: Ermine, $932.85; Fitch,

| Class of Merchandise | Opening Inventory | Purchases | Total for Period | Sales | Closing Inventory | Accounted For | Shortages |
|---|---|---|---|---|---|---|---|
| Ermine | None | 435 | 435 | None | None | None | 435 |
| Fitch | None | 225 | 225 | 21 | 19 | 40 | 185 |
| Mink | None | 410 | 410 | 30 | 61 | 61 | 349 |
| Hudson Seal | 562 | 1088 | 1650 | 35 | 200 | 200 | 1450 |
| Baum Marten | 31 | 62 | 93 | 19 | 4 | 23 | 70 |
| Persian Lamb | 231 | 618 | 993 | 15 coats 8 skins | 4 garments 39 skins | 393 | 600 |
| Fox | 142 | 481 | 623 | 320 | 3 | 415 | 208 |
| Totals | | 3,319 | | | | | 3,297 |

■ The foregoing table is based in part on estimate made by an accountant from the bankrupt's books, supplemented by invoices (pp. 3-11, 31, 32, 41, 42, 132-139). Of necessity estimates involved (though only to a small extent) some translation of figures, as to garments or figures as to prices at which sales were made, into numbers of skins, as well as resort to averages (pp. 19-38, 45, 46, 49-55, 127, 140, 141, 153-158). This was a proper method (Cf. In re Glassberg, D.C., 59 .F.2d 209); but in

$747; Mink, $3,999; Hudson Seal, $2,554.40; Baum Marten, $912; Persian Lamb, $7,547.-95; Fox, $8,199.75. Total, $24,892.95.

In this connection it may be noted that during the same period the bankrupt also purchased 120 Krimmers from the same sellers for $1,030, no part of which has been paid. For present purposes, however, these will be ignored.

In this connection it may be further noted, as above remarked, that the results of the independent proof indicate strongly,

—if they do not, indeed, afford an absolute demonstration,—that a deduction of 10% from the accountant's figures taken from the bankrupt's books was higher than necessary in order to get the truth as to what the shortages amounted to.

■ The fact that, according to the accountant's method (after allowing a 10% deduction), purchases during the whole accounting period aggregated 3,099 skins, coupled with the fact that 2,976 skins were bought only during four months immediately preceding bankruptcy for which over $24,000 is owing, is of itself enough to show that there are reasonable grounds for believing that the bankrupt has failed satisfactorily to explain his losses or deficiencies. If so, thereupon, by virtue of the proviso in the statute, the burden of proving that he is not guilty of such failure shifted to his shoulders.

■ We come, therefore, to inquire: Has the bankrupt made a satisfactory explanation?

At the 21a examination the bankrupt said that he could not tell or even give an estimate of what stock of furs he had on hand prior to the robbery or after the robbery and that he did not know how much, either in quantity or in value of furs, he lost by the robbery (21a, pp. 41, 42, 51-53). At the hearing on the specifications he made essentially the same statement and went no further (pp. 64-68, 97-104). In other words, he has made no explanation whatsoever save to say that there was a robbery. Without going further and making some showing, either of the quantity or of the value of furs taken by robbers, not only was there lacking a satisfactory explanation, but there was a complete failure at all to explain his loss or deficiency.

There are additional phases of the proof which also point to the same end. Some of these, which are either undenied or are incontrovertibly established, are as follows:

(1) On July 14, 1930, the bankrupt was in need of money. He was so pressed financially that he exchanged notes, totaling $837.50, with Louis Vogel. On the day he received the Vogel notes he discounted them at his bank. Both sets of notes were to mature subsequent to the robbery. The bankrupt has paid nothing either to Vogel or to the bank on the notes (21a, pp. 42, 43, 44-48).

(2) The purchases of skins during the four months preceding the robbery were for sums considerably more than double the amount of the deficiency in the assets of the bankrupt to meet his liabilities at the time of the bankruptcy. None of these skins have been paid for. What is owing for them constitutes all but an insignificant part of the total he owed for merchandise when the bankruptcy occurred.

(3) Apart from the unusual quantity of furs bought during the four months' period (May to September) a considerable proportion were of a type which a manufacturer would not need for sale or for producing garments from them until some time subsequent to the date of the robbery. Indeed, many of the purchases were out of season (pp. 46-48, 92-96). The bankrupt said he bought Ermines and Krimmers at bargain prices (pp. 92, 93), but he attempted no such explanation as to the six other types of furs.

(4) When inquired of concerning his purchases, while they were in progress, he evaded disclosing the volume, sought to deceive a friendly questioner from whom he bought a large quantity and gave misleading answers as to why he was making them (pp. 142, 143, 148-153).

(5) No effort was made to show that there were any losses from January 1 to September 20, inclusive. The bankrupt rested exclusively on the happening of September 21.

(6) The bankrupt also made no effort to show by any third person that anybody was seen leaving the premises with furs or with packages on September 21, nor does it even appear that the bankrupt made any effort to procure information or witnesses as to how the robbers left the building or what, if anything, they carried away with them. On the other hand, the police detective, who went to the bankrupt's place of business that day, did make inquiries in the neighborhood; but the result was wholly negative (pp. 72, 73). He says that subsequent to the day of the robbery the bankrupt told him the value of what he had lost, but that he (the witness) does not recall what the amount was (p. 81).

It is true that there is some testimony that on September 21, before the detective and an employee of the bankrupt (Bergang) arrived at the premises, a safe was empty or some safes were empty; also that after the two witnesses named arrived, some furs were scattered about the floor of the room and a safe was or some safes were empty (pp. 70, 71, 78, 81, 103, 104, 118, 120; 21a, pp. 39, 50). All of these statements, how-

ever, are very general and indefinite. They are wholly insufficient to constitute a satisfactory explanation of how much was lost by the robbery or even that anything was lost by it. Cf. Brenner v. Gaunce, 9 Cir., 28 F.2d 606.

Several arguments are advanced in behalf of the bankrupt. These will now be considered.

(1) It is urged that the computation by the trustee's accountant from the books as to the quantity of furs bought and sold by the bankrupt during the accounting period should be entirely rejected, because the chairman of the creditors' committee, who made the closing inventory, testified that a deduction should be made from what appears by the books. Yet the chairman had had long experience in the fur business in New York City of such a kind as entitles us to regard him as an expert and he said that, with such material as the accountant used, a safe computation within 10% of accuracy could be made.

Inasmuch as a 10% deduction was made on both sides of the account (purchases and sales), through reducing the book shortage by 10%, I see nothing unfair to the bankrupt and nothing which casts doubt on the accountant's estimate of the shortage. Moreover, as heretofore pointed out, the witness gave a plausible reason for adopting the 10% deduction. Again, as also heretofore pointed out, the exact figures as to purchases during the four months just prior to bankruptcy tend persuasively to show that the 10% deduction, applied in the present instance, was overly liberal to the bankrupt.

(2) It is suggested that the bankrupt has been deprived of an opportunity to examine his books or the inventories. This contention, however, is not sustained by the proof. The relevant books were put in evidence at the hearings on the specifications. A proved copy of the opening inventory was put in evidence then. An original closing inventory was likewise put in evidence. In addition, insofar as any shortage is asserted by the trustee, either the pertinent original invoices from the bankrupt's files or books of the bankrupt's customers were produced and used. The bankrupt's accountant was not refused a chance to examine any of these as much as he desired.

True the bankrupt's accountant testified that shortly after the filing of the bankruptcy petition, the documents were not always produced at his convenience on request (pp. 122-128) ; but he did examine the books after September 21 (p. 121) and there is nothing whatever to support the view that the bankrupt was deprived of access to anything which he desired or within reason sought.

On the proof there is nothing to cast doubt on the reliability of the shortage computation made by the trustee's accountant, save that perhaps it is unduly favorable to the bankrupt.

(3) The bankrupt says he had money in bank at the time of the robbery. From this he desires the inference drawn that he did not make away with any merchandise. What money was in bank, however, does not appear nor do I see that, whatever the amount, it would account for the merchandise which was short.

(4) Lastly, it is insisted that a return of merchandise by the bankrupt to one of his creditors rebuts the notion that he did anything wrong. The evidence is that on June 27 Bodek sent him twice as much as the bankrupt had ordered and that the bankrupt sent back a part, which was of the value of a little more than $2,000 (pp. 134, 135). It is plain, however, that the returned merchandise is not included in the shortage which the bankrupt is called on to explain. Moreover, why he rejected it is left purely speculative in the proof and, hence, the fact is entitled to no weight.

For the reasons assigned in this memorandum I am convinced that the second specification has been abundantly proved.

Accordingly, the referee's reports of December 6, 1935, and July 28, 1937, insofar as they concern the second specification, are reversed and the discharge of the bankrupt will be denied. Settle order on two days' notice.